**Louis P. DiNICOLA, Plaintiff,**

v.

**Dominick DiPAOLO, Donald Gunter, William Vorsheck, Edward Wayne Edwards, and the City of Erie, Defendants.**

**No. CIV. A. 94–323.**

United States District Court,
W.D. Pennsylvania.

March 31, 1998.

See also, 468 A.2d 1078.

David L. Hunter, Erie, PA, Ramsey Clark, Lawrence W. Schilling, New York, NY, David Rudovsky, Philadelphia, PA, for Louis P. DiNicola.

Gary Eiben, The McDonald Group, Erie, PA, for Dominick DiPaolo, Donald Gunter, Erie Police Department.

James D. McDonald, Brian M. McGowan, The McDonald Group, Erie, PA, for William Vorsheck.

Natalie Dwyer Haller, Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc., Erie, PA, for Edward Wayne Edwards.

Gary Eiben, The McDonald Group, Erie, PA, Gregory A. Karle, Dailey, Restifo & Dailey, Erie, PA, for City of Erie, Penn.

---

## MEMORANDUM OPINION

MCLAUGHLIN, District Judge.

Plaintiff Louis P. DiNicola brings the instant action against Defendants Dominick DiPaolo and Donald Gunter (former police officers for the City of Erie, Pennsylvania), William Vorsheck (a hypnotist formerly residing in Erie County), Edward Wayne Edwards (a former witness against DiNicola), and the City of Erie (the "City") under 42 U.S.C. §§ 1983 and 1988 and Pennsylvania state law. The claims arise out of Plaintiff's arrest and conviction in 1980 on charges of arson and second degree murder for which he was eventually retried and acquitted. This Court has jurisdiction over Plaintiff's claims based on 28 U.S.C. §§ 1331, 1343 and 1367(a).

Presently pending before this Court are motions by all Defendants for summary judgment. For the reasons stated below, these motions will be granted.

## I. BACKGROUND

On the night of August 30 and early morning hours of August 31, 1979, a fire ravaged a two-story residence at 622 West 16th Street in Erie, Pennsylvania. The fire claimed three lives, including two children of one Deborah Sweet, the first floor occupant. Plaintiff was suspected by the Erie police of being responsible for the fire. On March 26, 1980 he was arrested and charged with arson and three counts of murder in the second degree. On October 20, 1980, Plaintiff was convicted on all counts. His conviction was subsequently overturned by the Pennsylvania Supreme Court [1] and, following extensive interim proceedings, Plaintiff was retried and acquitted in May of 1994. This suit followed on November 23, 1994.

Plaintiff alleges that the Defendants acted to deprive him of his rights under both federal and state law. Count I of his amended complaint asserts claims under 42 U.S.C. §§ 1983 and 1988 for alleged violations of his Fourth Amendment right to be free from unlawful seizure (including arrest without probable cause, false imprisonment, and malicious prosecution), and his Fourteenth Amendment right to due process of law. Count II asserts a cause of action for malicious prosecution under Pennsylvania law.[2]

---

[1]. Although the Pennsylvania Supreme Court rejected DiNicola's claim on appeal that the evidence at trial was insufficient to support the verdict, the court vacated his conviction and granted a new trial on the ground that the trial court had committed prejudicial error by admitting certain hearsay testimony—i.e., testimony that an assistant district attorney had opined, in the presence of DiNicola, that DiNicola was the perpetrator of the fire. *See Commonwealth v.*

*DiNicola*, 503 Pa. 90, 468 A.2d 1078, 1081–82 (Pa.1983).

[2]. Plaintiff's second count originally asserted additional state law claims for false arrest, false imprisonment, spoliation of evidence, intentional infliction of emotional distress, defamation, abuse of process, willful misconduct, prima facie tort, conspiracy tort, negligence and gross negligence. By memorandum opinion dated January 10, 1996, this Court dismissed all of Plaintiff's

Underlying these claims are several central factual allegations, *viz:* (a) that Defendants, through highly suggestive hypnotic regression, procured false testimony from Deborah Sweet implicating Plaintiff as the perpetrator of the fire; (b) that, through Defendants' collaborative conduct, critical exculpatory evidence was destroyed and/or deliberately concealed from Plaintiff, from the judge who authorized his arrest warrant, and from the original trial court; (c) that Defendants Gunter and DiPaolo deliberately failed to record and retain evidence that implicated a different person in the crime; and (d) that false testimony from Defendant Edwards was used against Plaintiff in an effort to convict him in his second criminal trial. Plaintiff claims that his constitutional injuries were the proximate result of a practice or custom on the part of the City of failing to properly train, discipline and supervise its police officers and agents with respect to the constitutional rights of the criminally accused.

All Defendants have now filed motions for summary judgment with respect to all of Plaintiff's claims. Defendants Vorsheck and Edwards argue that they cannot be liable because they were not persons acting under color of state law for purposes of Plaintiff's federal claims and because their respective actions were not unlawful. Vorsheck further claims that, if he was in fact a state actor, he is entitled to summary judgment under the doctrines of collateral estoppel and/or qualified immunity. DiPaolo and Gunter likewise claim that they are entitled to summary judgment on the basis of qualified immunity. Alternatively, they claim that there is no evidence to establish any violation of Plaintiff's constitutional rights. The City contends that it is entitled to summary judgment on the § 1983 claim because Plaintiff has failed to adduce evidence of a municipal custom or policy that could have caused the alleged violations of his constitutional rights.

We conclude that summary judgment is appropriately granted in favor of Defendants DiPaolo and Gunter because, as a matter of law, they had probable cause to arrest Plaintiff and to assist in filing criminal charges against him. In the alternative, the Court

concludes that DiPaolo and Gunter are entitled to qualified immunity for their conduct.

Our resolution of the claims against DiPaolo and Gunter necessarily leads us to conclude that the claims against Vorsheck and Edwards, which are premised on essentially the same conduct, also fail as a matter of law. In short, there is insufficient evidence to establish that Vorsheck or Edwards committed any violation of Plaintiff's federal constitutional rights or that they violated his rights under Pennsylvania law. Alternatively, we conclude that Vorsheck and Edwards are entitled to summary judgment on DiNicola's § 1983 claims because DiNicola cannot establish that those individuals acted under color of state law. Finally, based on our resolution of the claims against the individual Defendants, we conclude that the City is likewise entitled to judgment as a matter of law.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon a motion for summary judgment, the non-moving party, to prevail, must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Knabe v. Boury Corp.,* 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In evaluating whether the non-moving party has established each necessary element, we must grant all reasonable inferences from the evidence to the non-moving party. *Id.* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). However, "[w]here the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348).

state law claims, with the exception of his claim

for malicious prosecution.

## III. DISCUSSION

### 1. *Plaintiff's Federal Claims*

■ Plaintiff's federal claims are brought pursuant 42 U.S.C. § 1983,[3] which provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C.A. § 1983 (West 1994). In order to maintain an action under § 1983, a plaintiff must demonstrate: (i) a violation of a right secured by the Constitution or the laws of the United States; and (ii) that the alleged deprivation was committed by a person acting under color of state law. *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996) (citation omitted).

### A.

■ We initially consider Plaintiff's claims against DiPaolo and Gunter premised on their alleged violations of his Fourth Amendment rights, including his right to be free from arrest without probable cause, false imprisonment, and malicious prosecution. The lack of probable cause is an essential element for each of these claims. *See Groman v. Township of Manalapan,* 47 F.3d 628, 634 (3d Cir.1995) (to prevail on false arrest claim under § 1983, plaintiffs would have to prove that the police lacked probable cause to arrest suspect); *Id.* at 636 (false imprisonment claim under § 1983 may be premised upon arrest made without probable cause); *Rose v. Bartle,* 871 F.2d 331, 349 (3d Cir.1989) (to establish a claim for malicious prosecution under § 1983, plaintiff must demonstrate that (1) the defendant initiated a criminal proceeding (2) which ended in plaintiff's favor (3) *the criminal proceeding was initiated without probable cause,* and (4) the defendant acted maliciously or for a purpose other than bringing the defendant to justice) (cita-

tion omitted) (emphasis added). Otherwise stated, the presence of probable cause is a complete bar to DiNicola's federal claims for false arrest, false imprisonment, and malicious prosecution. *See Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996) (citation omitted); *Williams v. Kobel,* 789 F.2d 463, 470 (7th Cir.1986); *Whitmore v. Smith,* No. Civ. A. 96–2745, 1997 WL 438441 at *5 (E.D.Pa., Jul 30, 1997); *Schertz v. Waupaca County,* 683 F.Supp. 1551, 1564 (E.D.Wis. 1988) (citing cases), *aff'd,* 875 F.2d 578 (7th Cir.1989); *Seip v. Newark Police Dept.,* 648 F.Supp. 489, 492 (D.N.J.1986).

■ Although the existence *vel non* of probable cause is normally a factual issue for the jury's determination, like any other factual issue it may be resolved by the court as a matter of law if no *genuine* dispute exists on the record—i.e. if, based on the evidence as a whole, a jury could not reasonably conclude that the officers lacked probable cause to make the arrest and institute criminal proceedings. *See Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir.1997) (citing *Deary v. Three Un–Named Police Officers,* 746 F.2d 185, 192 (3d Cir.1984)).

■ The concept of probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.'" *Sharrar,* 128 F.3d at 817–18 (quoting *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). Thus, the standard is an *objective* one and is to be applied based on the facts available to the officers at the time of their alleged unlawful conduct. *Barna v. City of Perth Amboy,* 42 F.3d 809, 819 (3d Cir.1994) (citing *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) and *Edwards v. City of Philadelphia,* 860 F.2d 568, 571 n. 2 (3d Cir.1988)). Whether the accused is ultimately convicted is of no moment: "Evidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law." *Id.* (citing *Henry v. United States,* 361

---

**3.** Plaintiff also seeks an award of attorneys' fees pursuant to 42 U.S.C.A. § 1988 (West 1994 and

1997 Supp.).

U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)). As long as DiPaolo and Gunter had some reasonable basis to believe that DiNicola had committed the crimes with which he was charged, the arrest and prosecution are justified as being based on probable cause. *See id.*

In order to determine whether Plaintiff can demonstrate a *lack* of probable cause on this record, we must undertake a somewhat extensive review of the facts. First, however, some commentary is warranted regarding this Court's factual scope of review. Plaintiff has challenged his arrest and prosecution on the basis that the affidavit in support of the arrest warrant contained material omissions and/or misrepresentations which, when corrected, vitiate probable cause. In other words, DiNicola posits that his arrest (albeit effectuated pursuant to an arrest warrant) was unconstitutional because the warrant was allegedly procured through deception on the part of DiPaolo and Gunter: "An arrest warrant does not defeat a claim of malicious prosecution where ... the plaintiff can show that the warrant was secured by fraud, perjury or other corrupt means." (Pl.'s Br. in Opp. to Summ. Judg. at 30 (citing *Rose v. Bartle, supra* )). Implicit in Plaintiff's position is the view that the existence *vel non* of probable cause is determined by examining the four corners of the affidavit in support of the arrest warrant.

▮▮▮ The Court does not agree that its review must be so limited. Instead, we will treat DiNicola's arrest as essentially a warrantless arrest, which is constitutionally valid as long as it was supported by probable cause. Furthermore, in analyzing the issue of probable cause, we will look beyond the information which the officers chose to include in their affidavit in support of the arrest warrant and will consider the totality of factors known to DiPaolo and Gunter at the time the arrest was effectuated and criminal charges filed. The Court fully recognizes that DiNicola was arrested at his home on March 26, 1980 and that, normally, when a person is arrested in his or her home, a warrant is required to properly effectuate the arrest. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."). However, federal courts have recognized an exception to this rule where exigent circumstances exist, or where entry into the home is consensual. *Steagald v. United States,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) ("[A]*bsent exigent circumstances or consent,* an entry into a private dwelling to conduct a search or effectuate an arrest is unreasonable without a warrant.") (emphasis supplied); *United States v. Cotnam,* 88 F.3d 487, 495 (7th Cir.1996) (recognizing that an individual can consent to a warrantless entry of officers into their home), *cert. denied,* —— U.S. ——, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996); *Parkhurst v. Trapp,* 77 F.3d 707, 710–11 (3d Cir.1996) (although warrantless arrests in public places are valid, greater burden is placed on an official who enters a home or dwelling *without consent* ) (citing *Payton,* 445 U.S. at 587, 100 S.Ct. 1371); *United States v. Vaneaton,* 49 F.3d 1423, 1428 (9th Cir.1995) (*Payton* left open only two ways for the government to overcome the presumption that warrantless seizure in the home is invalid: a showing of exigent circumstances or a showing of consent to the entry) (dissent), *cert. denied,* 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996); *United States v. Sager,* 743 F.2d 1261, 1263 (8th Cir.1984) (referencing in dicta *Payton* 's holding that police may not enter a suspect's home to make a routine felony arrest absent consent or a warrant), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985).[4] The "consent" exception is based on the recognition that an individual's privacy interest in the sanctity of his or her home is a primary concern behind the requirement for an arrest warrant. *See Payton,* 445 U.S. at 587, 100 S.Ct. 1371 ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."); *Parkhurst v. Trapp,* 77 F.3d

---

**4.** We note that *Payton* has been given retroactive effect as to arrests occurring before that decision was handed down. *See United States v. Johnson,*

457 U.S. 537, 562–63, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *Sager,* 743 F.2d at 1263.

at 711. This interest is not violated where officers gain *consensual* entry prior to effectuating an arrest in the suspect's home or dwelling.

In this case, there is no dispute but that DiPaolo and Gunter gained consensual entry into DiNicola's house on the morning of his arrest.[5] By virtue of this consensual entry, no warrant was technically necessary in order to lawfully arrest DiNicola, assuming that the arrest was otherwise supported by probable cause. *See, e.g., Stokes v. O'Connor,* Civ. A. Nos. 93–16, 93–208–SLR, 1994 WL 829066 at *8 (D.Del. June 30, 1994) (where police had lacked warrant to enter apartment dwelling in which plaintiff was arrested, plaintiff's fourth amendment claim under § 1983 would turn on whether police had consent to enter the apartment or whether exigent circumstances justified warrantless, non-consensual entry); *United States v. Tidswell,* 753 F.Supp. 1001, 1007 (D.Me.1990) (defendant voluntarily exposed himself to warrantless arrest by consenting to undercover agent's entry into his residence).

To sum up, we can view DiNicola's arrest as a lawful *warrantless* arrest as long as probable cause existed to support it. In making the latter determination, we consider the broad array of information known by the officers, i.e. the totality of the facts—not simply those facts which they chose to include in their affidavit in support of the arrest warrant. Accordingly, we will review in some detail the chain of events leading up to DiNicola's arrest and prosecution.

### (i) *The Background Facts* [6]

On the afternoon or early evening of August 30, 1979, DiNicola accompanied his friend, Michael Jefferson, from their workplace at the McCreary Roofing Company to Jefferson's home at 622 West 16th Street in Erie. Upon arriving at Jefferson's residence, the two men worked on Jefferson's truck, smoked marijuana and drank beer. Jefferson lived in the upstairs apartment with his mother, Cora Jefferson, and Cora's fiancé, Eugene Pitts.

While Jefferson and DiNicola were working on the truck, Deborah Sweet arrived home with her two children. Sweet had just recently moved into the first floor apartment. She began talking with Jefferson and DiNicola and eventually invited them inside her apartment for a beer. DiNicola retrieved a newly purchased case of beer from Sweet's car and carried it inside her apartment. Jefferson followed.

Inside the apartment, the three individuals talked, drank beer and smoked marijuana. At some time around 9:00 p.m. or shortly thereafter, Sweet put her two children, Alisa Minton (age eight) and Geoffrey Sweet (age four) to bed. At approximately 10:00 p.m., Sweet received a telephone call from a friend named Glen Martin. While Sweet was on the telephone, Jefferson, still dirty from his work, took a bath in Sweet's bathtub. When he was finished, DiNicola asked permission to take a bath and Sweet consented. Jefferson retrieved some additional marijuana and, while DiNicola bathed, he and Sweet smoked the marijuana and listened to music in Sweet's living room. Subsequently, while DiNicola was still in the bathroom, Jefferson and Sweet entered Sweet's bedroom and, with the door ajar, engaged in sexual intercourse. DiNicola subsequently exited the bathroom at the northwest end of the apart-

**5.** During a suppression hearing held on September 5, 1980 before the Court of Common Pleas, DiPaolo was questioned regarding the circumstances of the arrest. DiPaolo testified that, on the morning of March 26, 1980, he and Gunter went to DiNicola's home, explained that they wanted to talk to him, and were "invited" into the house by DiNicola. (Def.'s App., Vol. VI at 2754a–2756a.) The police report similarly indicates that DiPaolo and Gunter were "let into the house by DiNicola." (Def.'s App. Vol. V at 2179a.) Once inside, the officers attempted to persuade DiNicola to accompany them to the police station for further questioning. When DiNicola declined, they presented their warrant and arrested him. (*Id.*) DiNicola's attorney conceded during a telephonic conference held on January 16, 1998 that the officers' entry into the home was consensual. (*See* Doc. No. 145, at p. 6.) We therefore consider the issue of consensual entry to be conclusively established on this record.

**6.** The following facts appear to be undisputed on this record.

ment and proceeded past Sweet's bedroom toward the south end of the apartment.

Sweet and Jefferson remained in her bedroom together until, at some point around midnight, they arose to find that the apartment was engulfed in flames. DiNicola, Jefferson and Sweet exited the apartment through the only operable exit at the north end of her apartment. Sweet, unfortunately, was unable to save her children. Both Alisa Minton and Geoffrey Sweet perished in the fire, along with Cora Jefferson's fiancé, Eugene Pitts.

(ii) *The Criminal Investigation of the Fire at 622 West 16th Street* [7]

At the time of the fire at 622 West 16th Street, Defendants DiPaolo and Gunter were both employed as detectives with the Erie Police Department. They first became involved in the investigation of the fire on the morning of August 31, 1979. (Def.'s App., Vol. V at 2052a.) On that date DiPaolo and Gunter proceeded to the scene of the fire and found that two Pennsylvania State Police Fire Marshals, Troopers Roger Bellotti and Thomas May, were already in the process of investigating the cause and origin of the fire. Also present was John Kucinski, Chief Fire Inspector of the Erie Fire Department. Troopers Bellotti and May examined the interior and exterior of the house. Inside the house, they found evidence of "alligator" burn patterns on the floor of the den area.[8] The evidence suggested to the troopers that the fire was of incendiary origin, that it began from the inside of the house, and that a flammable liquid had been used by the perpetrator. (*Id.* at 2160a.) They ruled out accidental means or an electrical fire as possible causes. (*Id.*) The troopers located the den area on the first floor as the point of

origin. (Def.s' App., Vol. V at 2157a, 2162a.) They submitted samples of debris for chemical analysis, including pieces of burned floor boards. (*See generally* Def.s' App., Vol. V at 2156a–2162a.) Chemical testing would subsequently reveal the presence of a flammable liquid known as "stoddard solvent." Stoddard solvent was one of the substances used by the McCreary Roofing Company, where both Jefferson and DiNicola worked. (*Id.* at 2165a.)

Upon arriving at the scene of the fire, DiPaolo and Gunter began interviewing witnesses. (*See generally* Def.s' App., Vol. V. at 2052a *et seq.*) They took a detailed statement from Michael Jefferson, who had been with Sweet at the time the fire broke out. Jefferson essentially recounted the sequence of events on the night of the fire, as set forth above. He informed the officers that the last thing he remembered was being in bed with Sweet and awakening to the sound of DiNicola shouting, "Let's get out of here, there's a fire." Jefferson recalled that he got out of bed, looked into the dining room area and found the dining room fully engulfed in flames. He then ran from Sweet's bedroom out of the apartment. Once outside, Jefferson saw a number of neighbors congregated in the street. By this time, according to the police report of Jefferson's statement, the entire house was in flames. Jefferson recalled that he was not wearing shoes at the time, and that DiNicola was. Aware that his mother Cora was in the upstairs apartment, Jefferson stated that he asked DiNicola to kick in the door to the upstairs apartment and retrieve his mother, since DiNicola was not in bare feet. According to Jefferson. DiNicola complied and did in fact help Mrs. Jefferson out of the upstairs apartment.

---

**7.** Unless otherwise indicated, the following facts are undisputed on the record. Where a factual dispute exists, we construe the evidence (and any reasonable inferences arising therefrom) in the light most favorable to DiNicola, the non-movant.

In general, the evidence outlining the officers' criminal investigation can be found at Def.s' App., Vol. V [Doc. No. 93] at 2004a–2183a. The Court has also examined the depositions and trial testimony of the various state and local law enforcement agents, as it bears on the informa-

tion known by DiPaolo and Gunter during the course of their investigation.

**8.** Given the significance of the layout of Sweet's apartment, the Court has attached as Appendix 1 to this opinion a rough diagram of the floor plan as recorded by Trooper Bellotti. (The diagram is contained in the record at Def.'s App. Vol. V [Doc. No. 93], p. 2170a.) We note that, while the exact dimensions of the apartment may not be accurately reflected, the general floor plan is not in dispute and is sufficiently depicted in the diagram for present purposes.

DiPaolo and Gunter also interviewed Evelyn Wynkoop, the daughter of Cora Jefferson. Ms. Wynkoop informed the detectives that Cora had previously lived with a man by the name of Pete Moore for approximately 10 years and had broken up with Mr. Moore about one year prior to the fire. According to the police report, Ms. Wynkoop related that Mr. Moore had called Cora on several occasions, stating that he would stop the wedding between Cora and Mr. Pitts one way or another and that "he didn't care what happened but [Cora] would never marry" Mr. Pitts. (Def.'s App. Vol. V at 2054a.) Ms. Wynkoop advised that Mr. Moore had last contacted Cora Jefferson on August 25, 1979, just days before the fire. Another witness, Judith Pristello, confirmed that Pete Moore had argued with Cora Jefferson about one week prior to the fire and had made a statement to the effect, "You[ ] [and Pitts] will never be together as long as I can help it." (Def.'s App. Vol. V at 2054a.) Nonetheless, as discussed in more detail *infra*, the detectives' investigation into the whereabouts of Pete Moore on the night of the fire ultimately led them to believe that Moore had a solid alibi.

In addition to interviewing Michael Jefferson and Evelyn Wynkoop, DiPaolo and Gunter interviewed several neighbors who had witnessed the fire. By all accounts, the fire occurred shortly after midnight on the morning of August 31, 1979 and was very intense and fast moving. Some witnesses claimed that the entire house was up in flames in a matter of seconds. (Def.'s App., Vol. V at 2055a.) As a result of their interviews, the detectives were aware that both Sweet and Cora Jefferson had been taken to the hospital for treatment following the fire. Michael Jefferson had remained at the scene of the fire even after the firefighters arrived. Jefferson advised DiPaolo and Gunter that, to the best of his knowledge, DiNicola had left the scene of the fire shortly after it started and had gone to his mother's house to sleep.

On the afternoon of August 31, 1979, DiPaolo and Gunter interviewed DiNicola at a job site where he was working. (Def.s' App., Vol. V at 2056a *et seq.*) DiNicola corroborated the fact that he and Jefferson had been working together on Jefferson's truck after work the previous evening when Sweet arrived home with her children. He confirmed the fact that Sweet had invited the two men inside for beer and that he, Jefferson and Sweet had smoked marijuana that evening. DiNicola also remembered Sweet getting a telephone call that evening. He informed the officers that Sweet had seemed upset from the call and that she had instructed him not to answer the telephone if it rang again. Following the telephone call, DiNicola asked Sweet's permission to take a bath in her bathtub. Sweet consented. DiNicola told the detectives that, after finishing his bath, he came out of the bathroom and noticed that Sweet and Jefferson were in her bedroom. He claimed that he then went into the living room (at the southwest end of the apartment) and fell asleep on the couch in that room. He stated that he had been sleeping in the living room when something woke him up. Upon waking, he saw that the wall directly across from him, i.e. the east interior wall of the living room, was on fire. He claimed that he ran from the room, yelling and screaming that there was a fire in the home. Being unfamiliar with the house and the floor plan, he saw a door in the kitchen area which he tried to kick open, only to discover that the door he was kicking was the door to the bathroom. He claimed that he saw a light shining from one of the doors on the east side of the home and lunged through the door to the outside of the house. Jefferson followed behind him.

DiNicola further stated that, once outside, he ran to the front (south side) of the home and yelled for others to call the fire department. He thought he recalled going upstairs to take Cora Jefferson to safety, but he was not sure. Once the fire department had arrived and began fighting the fire, he had felt there was nothing that he could do and, it being late, he left the scene and went to his mother's house to sleep.

DiPaolo and Gunter next interviewed Cora Jefferson, who had been sleeping upstairs with Eugene Pitts at the time of the fire. Mrs. Jefferson confirmed that her son Michael, DiNicola and Sweet had been downstairs at the time of the fire, while she and

Mr. Pitts had been upstairs. Mrs. Jefferson recalled hearing screaming and smelling smoke. She then attempted to run down the stairs to safety. She recalled being about halfway downstairs when someone (she thought DiNicola) grabbed her arm and pulled her down to the ground. Meanwhile, Pitts was upstairs on the second floor. Some witnesses to the fire, along with Cora Jefferson, had yelled for Pitts to jump out of the window, but he did not do so and eventually died on the stairwell to the first floor.

DiPaolo and Gunter spoke with DiNicola again the following day, September 1, 1979. That morning, DiNicola came to the police station and was questioned about the exact location where he had allegedly been sleeping at the time of the fire. Upon DiNicola's request, the officers accompanied him to the scene of the fire so that he could physically show them where he had been sleeping. Together, they walked through the remains of Sweet's apartment. Upon entering the living room area, DiNicola grabbed a piece of wood and began digging through the ashes and debris. He remarked that, if he could locate his sandals, he would be able to point out where he had been sleeping. DiNicola explained that, upon awaking to the fire, he had run out of the house, leaving his sandals in the living room next to the couch on which he had lain. He dug through the debris and presented to the officers what appeared to be the burnt remains of a sandal. He pointed to that spot as the location where he had been sleeping. The detectives noted that a portion of a couch remained in place against the west wall of the living room in the southwest corner of the living room. DiNicola remarked that the source of the fire was probably the stereo. The stereo had formerly rested against the east interior wall of the living room, directly across from the couch on which DiNicola allegedly had lain.

On September 5, 1979, Troopers Bellotti and May returned to the scene of the fire. At the request of Detective DiPaolo, they undertook a more detailed inspection of the living room, especially the area around the stereo and the east wall of the living room. Low burn patterns in and around the stereo suggested to the troopers that this was an-

other point of intense burning and that, here too, some type of accelerant had been used. The troopers inspected the electrical outlet by the stereo and ruled out an electrical fire as a possible cause. They then collected additional samples, including a piece of floor board near the stereo and part of the cabinet which had held the stereo. These samples were submitted for chemical analysis. It was subsequently determined that the stereo cabinet showed traces of stoddard solvent.

DiPaolo next spoke to DiNicola on September 6, 1979 at Wilson Junior High School, where DiNicola was working on a job for McCreary Roofing. At that time DiNicola was again asked if there were any additional details that he could remember about the night of the fire. DiNicola stated that his memory from that night was somewhat "foggy," and that he could not recall what had taken place. He then inquired if the officers had determined whether the stereo was the cause of the fire. DiPaolo responded that the fire had not been electrical. According to the police report, DiNicola then remarked, "You know[,] arson is tough to prove, and in the back of your mind you might know who did it, but you can't prove it." (Def.'s App. Vol. V at 2062a.) It appears that DiPaolo found this remark significant, because he pointed out in the police report that no mention had been made to DiNicola about arson being the cause of the fire. (Id.) During this meeting, DiPaolo asked whether DiNicola would be willing to submit to hypnosis with the hope that it would aid his recollection of events. DiNicola agreed and commented that he wanted to find out what had actually happened that night. DiNicola also agreed to submit to a polygraph test.

Meanwhile, that same day Detective Gunter and Troopers Bellotti and May visited Sweet at St. Vincent's Health Center in Erie, where she had been taken for treatment. After reading Sweet her Miranda rights, Gunter and the state troopers took a tape recorded statement from her concerning the events that transpired on the night of August 30, 1979. Although Sweet could not recall all of the details of that evening, she did essentially corroborate Jefferson's statement about inviting the two men into her apart-

ment, smoking marijuana, allowing DiNicola to take a bath in her tub, engaging in sex with Jefferson, and being in bed with Jefferson at the time the fire broke out. (*See generally* Pl.'s App., Ex. B.)

Sweet recalled that, as she drove up to her house on the evening of August 30, 1979 with her children, she spotted DiNicola and Jefferson outside together smoking marijuana and drinking beer. She explained that she had previously had an argument with Jefferson about where he was parking his truck and, feeling badly about the argument, she sought to smooth things over and make amends. As Sweet approached Jefferson and DiNicola and began talking to them, they offered her some marijuana, which she tried. Sweet then asked if one of them would help her with a case of beer that she had just purchased. DiNicola retrieved the case of beer from the trunk of Sweet's car and carried it into her apartment. Jefferson also was invited into the apartment. Once inside, Sweet offered them each a beer. Sweet had only known Jefferson for a few days and had never before met DiNicola, whom she described to the police as a "weird person." Once inside, Jefferson, DiNicola and Sweet all sat around her kitchen drinking beer. At some point, Jefferson told Sweet that he had some marijuana for her to try. Sweet remembered telling Jefferson to go and get the marijuana while she put her children to bed. After Jefferson came back downstairs, they smoked the marijuana, which Sweet described as very strong. Sweet recalled asking "what about Louie?" and Jefferson replied that DiNicola had "been at it all day."

Sweet corroborated the fact that, while they were all in the kitchen, she received a telephone call from a friend in Texas. She remembered talking to him from approximately 10:00 to 10:30 p.m. During this time, she remembered sensing "commotion" in the kitchen—somebody left and reentered the apartment twice. Sweet also remembered being concerned that she had left her purse in the kitchen and that the purse contained several hundred dollars as well as her wallet and car keys. She recalled going into the kitchen, grabbing her purse and bringing the purse into the living room while on the telephone.

Sweet verified that, after she got off the telephone, DiNicola asked permission to take a bath in her bathtub. She consented. Sweet and Jefferson then proceeded into the living room and listened to music on her stereo. Sweet informed the officers that, during this time, she had candles burning; however, she strongly denied that these could have been a cause of the fire. Sweet explained that the candles were "dripless" candles, which were positioned in holders extending out from the wall. She explained that she had already partially burned the candles down the day before. Sweet also had other candles enclosed in glass cases which she felt were safe and could not have caused a fire. She recalled that she had a candle lit near the stereo in the living room; however, she claimed that this candle would not burn right and she did not believe it was even still lit by the time that she and Jefferson went into the living room to listen to music. She thought she recalled that the candle had been lit and had gone out a short time later. Sweet remembered being very high from the marijuana during this time when she was alone with Jefferson.

Sweet also recalled knocking on the bathroom door while DiNicola was taking a bath, and asking him to hurry up because she had to use the toilet. DiNicola told her to come in and stated that he would not look at her while she was in there. She then entered the bathroom and recalled DiNicola sticking his head out, with soap all over his face and saying, "See ... I promise, I won't look." Sweet then asked DiNicola to hurry up so that she could take a shower.

After leaving the bathroom, Sweet saw Jefferson standing at the corner of her bedroom. She and Jefferson entered her bedroom and began having sex with the bedroom door open. Shortly thereafter, Sweet recalled DiNicola coming out of the bathroom and passing by her bedroom door. She remembered hearing DiNicola "fumbling around" and asked Jefferson what DiNicola was doing. Jefferson replied, "Don't worry about him. He's okay. He's just drunk. He's just smashed. He'll sit down." Sweet

then expressed concern about DiNicola getting into her stereo. Jefferson again assured Sweet that DiNicola would be alright. Sweet recalled hearing "this racket going on ... like there's this fumbling around, and it was bugging me." She stated that the next thing she recalled was smelling smoke and seeing Jefferson jump up from the bed. Sweet recalled that she saw smoke everywhere. She claimed that she ran into the kitchen and saw smoke coming from the living room. She then ran into the dining room (or den area), and saw that smoke was swirling and rolling. She saw that the living room was in flames, "clear to the ceiling." Sweet recalled that she ran outside and began screaming for someone to save her children.

Insofar as DiNicola's actions were concerned, Sweet recalled hearing him "running around" the apartment prior to the time that she first noticed the smoke. She recalled DiNicola saying, "Come on, let's get out of here." Sweet commented to the officers that she had felt there was something strange about DiNicola. According to the transcript of the interview, Sweet remarked that:

> there was something about [DiNicola] because I remember I was ... when Mike and I were talking alone I was asking about Louie, you know, I said, "he's a weird dude." [Jefferson] says, "yeah, he's been taking stuff all day and he's been smoking all day and he's just pretty screwed up," and I said, "Oh, is that it?" And [Jefferson] said, "Well, he's kind of strange too, but he's my friend."

(Pl.'s App., Ex. E at 7.)

On September 10, 1979, four days after the interview with Sweet, DiNicola was escorted by DiPaolo and Gunter to the office of Defendant Vorsheck. (*See* Def.s' App., Vol. V. at 2067a *et seq.*) At deposition, DiNicola noted that the purpose for his going to see Vorsheck was to find out whether under hypnosis he could recall seeing another individual (presumably, the perpetrator) run out of Sweet's apartment ahead of himself on the night of the fire. Before entering Vorsheck's office, DiNicola was given his Miranda rights, which he verbally waived.

Gunter testified at deposition that, at one point early in the meeting, DiPaolo and Vorsheck briefly stepped into another room while DiNicola remained alone in the waiting area with Gunter. During DiPaolo's brief absence, DiNicola allegedly turned to Gunter and stated, "If it turns out I did this, I want the firing squad." Gunter testified that DiNicola then struck a "military pose" and mimicked "spraying the wall with a machine gun, including the at-at-at noises." (Def.s' App., Vol. III at 1158a.) This incident is also noted in the officers' police report. (Def.s' App., Vol. V at 2067a.)

What happened next is a matter of somewhat differing accounts. Gunter and DiPaolo each maintain that they remained downstairs together in the waiting area to Vorsheck's office while Vorsheck and DiNicola proceeded upstairs together to attempt hypnosis. Both officers testified that, at some point, Vorsheck came downstairs where they were waiting and related that the session was not going well and that DiNicola was "fighting" the hypnosis. Vorsheck then returned back upstairs to make another (apparently unsuccessful) attempt at hypnotizing DiNicola. However, DiNicola claimed at deposition that DiPaolo accompanied him and Vorsheck upstairs and remained in the same room until the attempted hypnosis was aborted. In any event, however, it is undisputed that Vorsheck was never able to achieve a hypnotic regression. DiNicola admitted at deposition that he thought he recalled Vorsheck telling him "you're not being cooperative."

It is also undisputed that, after the aborted attempt at hypnosis, Vorsheck and DiNicola proceeded downstairs into the waiting room area of Vorsheck's office. At some point, then Assistant District Attorney Shad Connelly arrived at the office and remained in the waiting area where the others were gathered. According to Gunter, a casual conversation ensued during which Vorsheck asked DiNicola whether he had ever been involved in a fire prior to the one at Sweet's apartment. DiNicola then volunteered that he had prior experience burning down sections of his barn by way of controlled fire. He spoke of starting a field fire on his farm. He also spoke of the fact that Indians had used controlled fires to burn out sections of forests. According to Gunter, DiNicola went on

at some length talking about fires, jumping from one fire subject to another, without any prodding or encouragement by the police. He spoke of a prior occasion burning a pile of manure, explaining how it fascinated him that the pile would burn very slowly and the fire would apparently die, then rekindle and eventually consume the entire pile. According to Gunter, DiNicola started "rambling" about being in Vietnam and how when the "Ho Chi's catch fire, . . . you run for your life and dive in ditches." Gunter recalled that DiNicola seemed to have a fascination with fires. DiPaolo in his deposition described DiNicola as "excited" while carrying on this discourse about fires. In their police report, DiPaolo and Gunter recounted this exchange thus:

> It seemed that once DiNicola started talking about this area of fires he became very involved in it. Then it got to the point where he realized what he was doing, that he was talking about it and making us know that he knew a lot [sic] about fires and he stated "you really think that I burned those kids up". Dr. Horshak [sic] stated at this time "nobody stated that you did". Then all of a sudden the subject of fire was gone and he wouldn't talk about it any more.

(Def.'s App., Vol. V at 2067a.)

DiNicola does not dispute that this conversation occurred, but he characterizes the context in which it occurred somewhat differently. He claims that the conversation took place only between himself and Gunter. He claims that Gunter, being a former member of the military (like DiNicola), asked DiNicola if he had ever been involved in fires before. DiNicola then related his experience of seeing bombings in the Vietnam War and his experience of burning the remains of an old barn on his property.

In any event, after this episode at Vorsheck's office, both DiPaolo and Gunter were focussing on DiNicola as a prime suspect in the fire. As reflected in a police report dated September 13, 1979, the detectives found it significant that certain of DiNicola's statements appeared to be untrue. (Def.'s App., Vol. V at 2068a.) For example, DiNicola had stated that, upon discovering the fire, he had run into Sweet's bathroom due to his lack of familiarity with the apartment, then ran out of the house without any shoes on. However, Jefferson had stated that he asked DiNicola to kick down the door to the upstairs apartment because he saw that DiNicola had sneakers on. Cora Jefferson had verified that DiNicola did, in fact, bring her out of the burning house. Thus, there was a discrepancy in the facts in terms of what, if anything, DiNicola was wearing on his feet at the time of the fire.

Seeking to obtain more information from Jefferson, DiPaolo and Gunter requested that he undergo a polygraph examination at the Erie police station. The officers apparently suspected that DiNicola might have talked to Jefferson about the night of the fire, since the two men were friends and co-workers. Jefferson did submit to a polygraph examination on September 12, 1979. A police report indicates that, about half-way through the examination, Jefferson got upset about some of the questions he was asked and refused to continue. (Def.s' App., Vol. V at 2068a.) However, it was noted that during the course of the polygraph exam Jefferson had tested deceptive to two questions: "Do you know anything about the fire?" and "Do you know who possibly might have been responsible for the fire?" (*Id.*)

Following the polygraph, Jefferson was given his Miranda rights and interrogated. A police report indicates that Jefferson denied any involvement in the fire or any knowledge concerning it. He stated, however, that DiNicola had advised him the previous morning "just to tell the police that the f—— place was unfit to live." (Def.'s App. Vol. V at 2069a.) Jefferson also related that DiNicola talked about fires and barns all the time and had burned his own barn down. The officers asked Jefferson again about his recollection as to what, if anything, DiNicola was wearing on his feet at the time of the fire. Jefferson remained steadfast in insisting that DiNicola had been wearing something on his feet. He specifically remembered that this was the reason he had directed DiNicola to kick in the door to his mother's apartment.

While under interrogation, Jefferson again went over the events in Sweet's apartment prior to the fire. He recalled that he, Sweet, and DiNicola had all smoked marijuana that evening and were "a little high." According to the police report, Jefferson told the officers that "they" (presumably he and DiNicola) had been grabbing Sweet and kissing her. Jefferson corroborated Sweet's previous recollection of going into the bathroom while DiNicola was bathing. He recounted going into Sweet's bedroom and having sex with her, after which he had dozed off to sleep. Jefferson claimed that Sweet woke him up, asking "What the hell is all that noise?," to which he replied that it was "probably [DiNicola] getting sick." Jefferson claimed to have seen DiNicola walking or running in a position bent over as if he was going to vomit. He described DiNicola as appearing "like a mad-man," ranting and raving and knocking things over, appearing as if he was running from something, making noises. In contrast to his original statement, Jefferson now denied that DiNicola had ever yelled "fire, let's get out," or anything of that nature. He insisted that what woke him and Sweet up was the sound of DiNicola "banging into everything" in the apartment. By the time he and Sweet realized that there was a fire in the house, they had to run out because the apartment was engulfed in flames and it was too late to get the children. Jefferson told the officers that, after he had exited the house and things had calmed down, "he thought in his own mind that it appeared as if DiNicola had been up for awhile and had not been sleeping." He also recalled that DiNicola had been "too cool" in terms of not panicking over the fire. (Def.s' App, Vol. V at 2069a.)

During the interrogation, the issue was raised whether Jefferson knew something more than he was telling the police. Jefferson reportedly remarked, "You know Louie's

Italian and he's got a lot of relatives." DiPaolo and Gunter apparently took this as an indication that Jefferson had more information but was afraid to talk. (Def.s' App., Vol. V at 2070a.) Their report indicates that the detectives "hammered" him on that point, but Jefferson denied any additional knowledge about the fire.

On September 17, 1979, DiPaolo and Gunter returned to the office of Defendant Vorsheck with Deborah Sweet, who had agreed to undergo hypnosis in an effort to assist the investigation. What occurred during this hypnotic session is a matter of some disagreement between the parties. However, it is undisputed that Sweet was successfully placed in a hypnotic regression and, while under hypnosis, gave a more detailed account of the night of the fire.[9] (See generally Pl.'s App., Ex. R.) In this account, Sweet related a number of facts that incriminated DiNicola in the fire. For example, Sweet recalled an incident earlier in the evening when DiNicola had made a "pass" at her, which she rejected—thus buttressing a possible motive for starting the fire. She also specifically remembered hearing DiNicola leave the house during the time that she was in bed with Jefferson, and recalled that the door had not locked behind him. This fact was consistent with the officers' theory that DiNicola left the house to obtain the accelerant while Jefferson and Sweet were in bed together. Sweet further recalled having some concern while in bed with Jefferson that DiNicola might "bother" her daughter. Finally, she recalled coming out of her bedroom after the fire started and seeing DiNicola standing over the fire and staring at it.[10]

Meanwhile, DiPaolo and Gunter engaged in efforts to locate Pete Moore, the former boyfriend of Cora Jefferson. A police report indicates that Moore was located on September 20, 1979 and, after receiving Miranda

9. As explained in more detail below, we do not rely on the evidence taken from Sweet's hypnotic regression in making our probable cause analysis.

10. We also note that there is some evidence that Sweet was also interviewed at the Erie Police Station on September 14, 1979, prior to her hypnotic session with Vorsheck. According to a

police report dated September 14, 1979, Sweet gave essentially the same incriminating facts during this interview.

Plaintiff, however, has challenged this evidence on the ground that there is a genuine issue of fact as to whether the interview actually occurred. For purposes of this opinion, we will adopt the Plaintiff's view and discount this evidence.

warnings, gave a statement to the police. (*See* Def.s' App., Vol. V at 2036a, 2083a.) Moore admitted having made threatening statements to Cora Jefferson in the past, but stated that he still loved Cora and would never do anything to harm her. In his statement, Moore claimed to have spent the evening of August 30, 1979 with a companion attending various bars and ultimately spending the night at his companion's house in McKean, Pennsylvania. Moore agreed to take a lie detector test, which was performed on October 1. According to Detective Robert Johns, who performed the test, Moore passed the polygraph without any signs of deception. A police report generated by DiPaolo and Gunter on October 3, 1979 indicates that they felt Moore at that point had been cleared as a possible suspect. (Def.s' App., Vol. V at 2083a.)

DiNicola had likewise been scheduled to take a polygraph examination, which was administered by Detective Johns on October 2, 1979.[11] A police report notes Detective Johns's belief that DiNicola had deliberately undermined the polygraph results by moving around in his chair and coughing during the interview. In addition, Detective Johns felt that DiNicola had tested "deceptive" in response to two questions: "What do you know about the fire?" and "Did you start the fire?"[12] (Def.'s App., Vol. V at 2083a.)

Following the polygraph, DiNicola was again given his Miranda rights and was interrogated by DiPaolo and Gunter. (*See generally* Def.s' App., Vol. V at 2082a, 2084a *et seq.*) Then Assistant District Attorney Shad Connelly was also present. According to the officers' report, DiNicola began talking like a "rav[ing] maniac," stating that he thought the fire was an electrical fire and that DiPaolo and Gunter just wanted to stick a charge on someone, that the house was not fit to live in, that there was "no way" this fire was an arson and that the whole thing was just "an insurance job." (Def.s' App., Vol. V at 2082a, 2084a.) The officers then asked DiNicola about Sweet knocking on the bathroom door while he was bathing. He responded that this incident never happened and that the police were "crazy." He denied ever leaving Sweet's apartment after his bath and specifically denied starting the fire. (*Id.*) The report also recounts that DiNicola began screaming that the police thought he is a "kid killer" and that they were "nuts." (*Id.*) DiNicola then asked ADA Connelly what he thought. Connelly replied that he thought DiNicola had started the fire.[13] DiNicola responded that "they" were all "f——— toads," and were crazy. Upon being informed that he was free to leave, DiNicola departed the police station. (*Id.* at 2082a.)

On January 30, 1979, DiPaolo and Gunter met with Assistant District Attorneys Shad Connelly and Michael Cauley and Captain Ruffo of the Erie Police Department. (Def.s' App., Vol. V at 2091a.) After they reviewed all of the police reports in the case, it was agreed that DiNicola would be charged for the arson and homicides. Subsequently, a conflict arose which ultimately disqualified the entire Erie District Attorney's office from further involvement in the case and resulted in further delays. Attorney Michael Fetzner was later appointed as special prosecutor. Mr. Fetzner directed that certain actions be taken prior to the filing of charges against DiNicola. Among other things. Fetzner directed that the Erie police; (i) check with the gas company for the possibility of a gas leak at Sweet's residence; (ii) contact the owner of Sweet's apartment relative to any prior fires that may have occurred at the premises; (iii) check Sweet's mental history for incidents of prior mental

---

**11.** Prior to the examination, DiNicola was read his Miranda rights, which he waived.

**12.** During an in-chambers conference on January 20, 1998, Plaintiff's attorney indicated his client's disagreement with the representation that he failed any part of his polygraph exam. (*See* Doc. No. 146 at pp. 5–8.) However, we are unable to locate any evidence on this record (apart from counsel's arguments) indicating that Detective Johns's opinion was ill-founded or oth-

erwise suspect. And, in any event, it is undisputed that DiPaolo and Gunter were not present for the polygraph examination. Nothing in this record suggests that they had any apparent basis upon which to question Detective Johns's representations.

**13.** It was the admission of this statement into evidence at DiNicola's first criminal trial that ultimately led the Pennsylvania Supreme Court to overturn his conviction.

health treatment; and (iv) obtain a statement from Cynthia Pryber, Pete Moore's alleged companion on the night of the fire. (Def.s' App., Vol. V at 2092a.)

All of the foregoing requests were fulfilled by the police. (*See* Def.s' App., Vol. V at 2093a *et seq.*) The owner of Sweet's apartment house, Charles Scalise, was contacted regarding the issue of prior fires at 622 West 16th Street. It was determined that a fire had previously occurred at the house in 1976 as the result of the second floor tenant smoking in bed. The renovation of the house had been paid for by insurance. At the time of the fire on August 30–31, 1979, the house had been insured for approximately $23,000.00. Upon contacting National Fuel Gas company, the police were advised that no leak was detected in the gas line leading to the house. However, the inside line and appliances could not be tested due to fire damage. In addition, the officers investigated Sweet's mental health history and learned that her hospitalization at St. Vincent's Health Center following the fire was the first time she had ever received mental health treatment. Finally, on February 11, 1980, the police took a statement from Cynthia Pryber. Ms. Pryber stated that she was with Pete Moore from 4:30 p.m. on August 30, 1979 until about 9:30 a.m. the following morning. During that time, Pryber and Moore were reportedly together at the K & Z tavern, then subsequently the McKean Tavern, and then finally Pryber's home in McKean. (Def.s' App., Vol. V at 2041a–42a.) Following DiNicola's arrest, Pryber's brother corroborated the fact that the couple were at Pryber's house at least between the hours of 11:00 p.m. to 1:00 am on the night of the fire. (*Id.* at 2028a–29a.)

On March 26, 1980 DiNicola was arrested and charged with arson and three counts of murder in the second degree.

(iii) *The Issue of Probable Cause*

 As discussed *supra*, probable cause exists when the "facts and circumstances are 'sufficient to warrant a prudent [person] in believing that the [suspect] had committed

... an offense.'" *Sharrar*, 128 F.3d at 817–18 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). Based on an extensive review of the record, including all of the in-court testimony, depositions and reports of state and local law enforcement agents documenting their investigation, the Court concludes that no genuine issue of fact exists as to probable cause because, as a matter of law, DiPaolo and Gunter had probable cause to believe that DiNicola committed the offenses for which he was arrested and charged.

By the time that DiNicola was arrested and charged in March 1980, the investigation had been ongoing for over six months. Dozens of witness interviews had been conducted, as is documented in the criminal investigation file and, in particular, multiple statements had been taken by the key witnesses. The state fire marshals, after conducting an investigation into the cause and origin of the fire, had ruled the fire an arson. There was evidence that the perpetrator had used a flammable liquid subsequently identified as stoddard solvent. This effectively ruled out the possibility that the fire had been started by accidental means or that it was an electrical fire, notwithstanding DiNicola's protestations to the contrary.[14] The accelerant used in the fire had been identified as one of the solvents used by and available at the McCreary Roofing Company, where both Jefferson and DiNicola worked. It had also been established that Stoddard Solvent was sold only in 55 gallon drums to commercial establishments.

In addition, multiple statements obtained from Jefferson, Sweet and DiNicola all corroborated the fact that DiNicola was the only one of the three adults in Sweet's apartment unaccounted for at the time the fire broke out and, thus, the only one of the three with the apparent opportunity to start the fire. Especially noteworthy is the physical layout of Sweet's apartment which, when considered in light of the point of origin of the fire, supports the officers' suspicion that DiNicola was the perpetrator. Having seen Sweet's

---

**14.** Notably, even at his deposition DiNicola continued to insist that the fire had not been incendi- ary in nature.

apartment first hand, DiPaolo and Gunter were aware that there was only one operational entrance and exit, which was located at the north end of the apartment off of the kitchen.[15] They were also aware that DiNicola claimed to have fallen asleep in the living room, which was located at the opposite end of the apartment, at the southwest corner of the building. The officers were further aware that accelerant had been spread both in the den and around the stereo in the living room. The fire marshals' testimony and reports establish that they believed the fire had started in the den and proceeded into the living room area. DiNicola had claimed that he was asleep in the living room when he awoke to the sound of the fire, and then fled the house. In order to believe DiNicola's account, one would have to accept that the perpetrator entered the house, passed by Sweet's open bedroom door without being detected either by Sweet or Jefferson, proceeded through the den to the living room—the very room in which DiNicola claimed to be sleeping—sprinkled accelerant over the stereo in that room, and then proceeded back through the apartment, again without being detected.[16] One also must accept that, although DiNicola never heard the intruder in the very room where he slept, he managed to awake to the fire in time to make a narrow escape out of an apartment with which he lacked familiarity, despite his reportedly intoxicated state and the presence of thick smoke in the house. Indeed, not only did he escape unharmed from the house, but he was the first one out. By all accounts, the fire was extremely fast moving and consumed the entire house within minutes—even seconds, according to two witnesses. (Def.s' App., Vol. V at 2055a.)

Thus, DiNicola would have to have awoken just moments after the fire was started. And, moreover, he would have to have passed through the doorway from the living room into the den—an area identified by the Pennsylvania State Police as one of heavy burning, and also traverse the den area, which the fire marshals located as the point of origin. Given these obstacles, the window of opportunity for DiNicola to make a safe exit from the apartment was narrow indeed, assuming his version of events. At the same time, it is evident that Sweet's children, who were presumably more familiar with the apartment, and whose rooms were not found to contain traces of accelerant, could not manage to escape in time to save themselves. In the face of such evidence, prudent police officers would have been justified in finding DiNicola's account somewhat dubious.

At the same time, DiPaolo and Gunter had information from Sweet's original (September 6, 1979) statement which suggested that DiNicola had been up and about in the apartment making "a racket" while she and Jefferson were in bed together. Jefferson corroborated the fact that he and Sweet had heard DiNicola moving about in the apartment and "banging into everything." (Def.s' App., Vol. V at 2069a.) This information placed DiNicola in the apartment and moving about prior to the outbreak of the fire. It is plausibly consistent with the officers' theory that, while Sweet and Jefferson were in bed together, DiNicola had obtained the solvent and was spreading it about the apartment. Moreover, DiNicola's deposition testimony suggests that the officers questioned him about whether he had seen anyone leaving the apartment ahead of himself. Thus, they

---

**15.** There was also an entrance at the southeast corner of the apartment which had been boarded shut at the time of the fire. (Def.s' App., Vol. VI at 2562a–63a.)

**16.** We note that this arguable implausibility was an evidentiary factor that the Pennsylvania Supreme Court viewed as supportive of DiNicola's conviction in the first criminal trial:

Evidence of DiNicola's culpability includes the following:

\* \* \* \* \* \*

(4) DiNicola's suggestion that an unknown intruder could have started the fire would re-

quire that the jury believe the intruder, without being detected, splashed an accelerant in two rooms, including the room measured 12' × 11', where DiNicola told the police he was sleeping on a couch, and ran from the house without being heard.

*Commonwealth v. DiNicola*, 468 A.2d at 1080 (rejecting contention that evidence did not support conviction but vacating conviction on other grounds).

apparently pursued the theory that another individual other than DiNicola might have started the fire. However, DiNicola consistently denied ever seeing an intruder in the apartment even though, according to his account, he would have had to have awoken just moments after the fire was ignited.

Apart from the issue of opportunity, there was evidence to suggest that DiNicola had knowledge concerning fires. As noted above, DiNicola had made known his familiarity with controlled fires during his September 10, 1979 encounter with DiPaolo and Gunter at Vorsheck's office. The police obviously found DiNicola's comments and his demeanor significant. Gunter, for example, testified at deposition that DiNicola seemed to have a "fascination" with the subject of fire, and it was this exchange at Vorsheck's office that led Gunter to believe that DiNicola actually "was capable of doing what was done."

In addition, the police were aware of several other statements by DiNicola that were, at the least, suspicious. They were aware, for example, of DiNicola's suggestion that the fire was electrical and that the stereo was the source. Subsequent investigation by the state fire marshals revealed that the stereo area had been doused with stoddard solvent. DiNicola's focus on the stereo as a possible source of the fire is somewhat significant in light of the fire marshals' finding that the fire began in the den and progressed into the living room. According to the fire marshals' theory, by the time DiNicola awoke to see the stereo and east wall of the living room in flames, the den would already have been engulfed in flames. In light of these facts, prudent police officers in the position of DiPaolo and Gunter could reasonably have viewed DiNicola's suggestion as an attempt to divert their attention from a possible arson and mislead them into believing that the fire was electrical.

DiNicola had also remarked that "arson is hard to prove" and that the police might think they knew in the back of their minds who had committed it and yet not be able to prove it. This unsolicited statement also could reasonably be viewed as suspicious, if not incriminating. Indeed, DiPaolo's police report reflects the fact that he found this statement significant, especially in light of the fact that no mention had been made to DiNicola of the fire being an arson.[17] In addition, DiNicola had remarked to Gunter while at Vorsheck's office, "If it turns out I did it, I want the firing squad." Once again, this statement could reasonably be viewed as inculpatory, inasmuch as it suggests the possibility that DiNicola set the fire, but blocked it out of his mind.

It is also apparent from the record that the police began to suspect that DiNicola was being untruthful about certain key facts. Chiefly, they were aware from Michael Jefferson that Jefferson specifically recalled DiNicola wearing something on his feet. The police could also consider DiNicola's own statement in his August 31, 1979 interview that, in attempting to exit the house, he kicked in a door which he thought was an exit, only to discover that he had kicked in the bathroom door. These facts tended to contradict DiNicola's contention that he had run out of the house with nothing on his feet after awakening to the fire. The fact that DiNicola may have been wearing something on his feet at the time of the fire was a fact of some significance to the officers because it was consistent with their theory that DiNicola had left the house and returned with the accelerant while Jefferson and Sweet were together in Sweet's bedroom. It would also contradict DiNicola's account that he was asleep just prior to the outbreak of the fire and, upon awakening, immediately ran out of the house without even putting shoes on.

**17.** The record contains some suggestion that contemporaneous news accounts of the fire may have raised the issue of arson or, alternatively, that the issue might have been raised during DiNicola's walk through Sweet's apartment with DiPaolo and Gunter on September 1, 1979. Suffice to say that DiNicola's deposition testimony is unenlightening on this point and there is no

evidence of record demonstrating the officers' awareness that, in fact, DiNicola had come to know of the incendiary nature of the fire through these other sources. In short, the Court finds nothing in the record to undermine its conclusion that DiNicola's "arson" statement could reasonably be viewed by the officers as suspicious.

The police also had a statement from Michael Jefferson, taken on September 12, 1979, in which Jefferson recalled being outside after the firefighters had arrived. According to the police report, Jefferson stated that he had found DiNicola to be "too calm" in regards to the fire and had the impression that DiNicola had been up for awhile prior to the fire. Jefferson's impression is inconsistent with DiNicola's claim that he was awakened by the sound of the fire and immediately ran out of the house.

In addition, Jefferson and Sweet agreed that Sweet had entered the bathroom while DiNicola was in there bathing. DiNicola denied this encounter. This fact was potentially significant in that the officers entertained the theory that DiNicola might have been motivated to start the fire by his sense of sexual rejection and a desire to have revenge against Sweet. DiNicola's denial of the bathroom incident could reasonably be viewed as an attempt to deny an intimate contact with Sweet.

DiPaolo and Gunter were further aware that DiNicola had submitted to a polygraph examination and that, in the opinion of Detective Johns, DiNicola had intentionally undermined the results. This information, which the officers had no apparent basis to question, could be interpreted as consciousness of guilt. Further, the examiner had informed DiPaolo and Gunter that DiNicola tested deceptive to two questions: "What do you know about the fire?" and "Did you start the fire?" Many circuit courts of appeals have held that officers may utilize evidence of deceptive polygraph results in establishing probable cause to effectuate an arrest. *See Craig v. Singletary,* 127 F.3d 1030, 1046 (11th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1323, 140 L.Ed.2d 486, 1998 WL 73239 (1998); *Johnson v. Schneiderheinz,* 102 F.3d 340, 342 (8th Cir.1996); *Booker v.*

*Ward,* 94 F.3d 1052, 1058 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 952, 136 L.Ed.2d 840 (1997); *Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991); *Marx v. Gumbinner,* 905 F.2d 1503, 1507 (11th Cir.1990); *Bennett v. City of Grand Prairie, Texas,* 883 F.2d 400, 405–06 (5th Cir.1989). The officers were also aware that Michael Jefferson, a friend of DiNicola, had tested deceptive to two questions: "Do you know anything about the fire?" or "Do you know who possibly might have been responsible for the fire?" They could thus reasonably infer (as they apparently did) that Jefferson had additional information concerning the fire which he was not disclosing. Indeed, when the officers questioned Jefferson about this possibility, Jefferson remarked, "you know[,] Louie's Italian and he's got a lot of relatives." The officers interpreted this to mean that Jefferson might have information inculpatory of DiNicola but was afraid to talk.

Finally, the police reports indicate that DiPaolo and Gunter had effectively ruled out Pete Moore as a suspect in setting the fire, due to his apparently solid alibi and the fact that he had reportedly passed a polygraph exam. Also excluded as a possible suspect was Glen Martin, the person with whom Sweet had talked on the telephone on the night of the fire. It is uncontradicted on this record that Martin was in Texas at the time of the fire.[18] In light of these facts, we think that DiPaolo and Gunter had adequate probable cause as a matter of law to believe that DiNicola had started the fire. Stated differently, no reasonable jury could conclude in light of these facts that DiPaolo and Gunter *lacked* probable cause to arrest and charge DiNicola.

In arriving at this conclusion, the Court is fully aware that there are certain gaps in the investigation that DiPaolo and Gunter were

---

**18.** Indeed, a review of the criminal file indicates that, even after DiNicola's arrest, DiPaolo and Gunter took steps to investigate and rule out a number of leads as to other possible suspects. For example, the officers investigated and ruled out a lead that an individual by the name of Joseph Bryan had caused the fire by lighting a stick of dynamite under Sweet's house. (*See* Def.s' App., Vol. V at 2022a, 2152a.) They also investigated a lead (developed by friends of DiNi-

cola) that one Thomas Evans had been responsible for the fire. (*Id.* at 2115a–17a.) Evans was questioned by the officers and eventually submitted to a polygraph examination, which he reportedly passed. (*Id.* at 2137a.) DiPaolo and Gunter even looked into alleged reports implicating Sweet herself in the fire. (*See id.* at 2043a *et seq.*) Finally, they continued to investigate Pete Moore based on information provided by friends of DiNicola (*Id.* at 2135a–36a.)

never able to completely resolve. For example, while the evidence suggested several possibilities as to a motive or reason for DiNicola starting the fire, the officers were never able to conclusively resolve this issue. One possible theory held by DiPaolo was that DiNicola started the fire in order to conceal an assault on Sweet's daughter. DiPaolo claims to have developed this theory as a result of his conversations with the state police fire marshals. Specifically, DiPaolo recalled being informed that Alisa Minton's carbon monoxide level was 45%, while the carbon monoxide levels of the other two victims were each 70 percent.[19] In addition, DiPaolo recalled being informed that Alisa's body had been found on her bed with the sheets beneath her still white. Conversely, the body of her younger brother had been discovered at the foot of his bedroom door. DiPaolo felt these facts suggested that Alisa had never moved from her bed during the course of the fire. He therefore formed the impression that "something was done to the little girl." However, an initial autopsy performed shortly after the fire occurred revealed no evidence of a vaginal assault on Alisa Minton.

Another possible theory (and one specifically entertained by Gunter) was that DiNicola may have started the fire as an act of revenge in retaliation for feeling sexually rejected by Sweet. The strongest evidence of a rebuffed sexual advance by DiNicola comes from Sweet's alleged statement of September 14, 1979 and her hypnotically induced statement of September 17, 1979—both of which (as explained *infra*) the Court will disregard for purposes of its "probable cause" analysis. Even absent this evidence, however, there is sufficient circumstantial evidence from which a motive of revenge could be established. For example, a police report of Jefferson's September 12, 1979 interview with DiPaolo and Gunter reflects Jefferson's

statement that "they"—presumably DiNicola and Jefferson—were "grabbing and kissing" Sweet on the night of the fire. (Def.s' App., Vol. V at 2069a.) Another report dated April 8, 1980 summarizes an interview with Jefferson held on October 6, 1979, during which Jefferson reportedly remembered that Sweet and DiNicola were "mugging it up in the living room" on the night of the fire. (*Id.* at 2143a.) This constitutes at least some evidence that DiNicola had made advances at Sweet during the course of the evening. In DiNicola's first statement to the police on August 31, 1979, he admitted coming out of the bathroom after finishing his bath and noticing that Sweet and Jefferson were in her bedroom together. It is undisputed that Sweet and Jefferson had engaged in sexual intercourse while the door to her bedroom was open. Based on this evidence, it would not be objectively unreasonable for the officers to have pursued a theory of sexual rejection as a possible motive.[20]

Even absent a clear motive, however, the case against DiNicola did not suffer from a lack of probable cause. The officers knew that Sweet, Jefferson and DiNicola had been drinking and smoking marijuana on the evening of the fire. According to Sweet's statement of September 6, 1979, Jefferson had commented that DiNicola was "messed up" and "had been at it all day." It would not be objectively unreasonable for the police officers to believe that DiNicola had committed a random and bizarre act of violence due to the influence of alcohol and drugs, coupled with his perceived "fascination" with fires. And, if the officers lacked any clear motive on the part of DiNicola, they certainly lacked any solid leads as to any other possible suspects who might have had a stronger motive to start the fire. As we previously observed, DiPaolo and Gunter had effectively ruled out Pete Moore and a number of other individuals as possible suspects.

19. The Court acknowledges that there is some confusion in the record as to whether Pitt's CO level was in fact 70% or in instead somewhere in the vicinity of 35%.

20. The Court is aware of evidence that Jefferson referred to Sweet as a "party girl" and, at one point, opined to the officers that DiNicola could have "had" Sweet if he had wanted. This evidence, however, does not render the "revenge" theory unreasonable, nor does it otherwise affect this Court's assessment of probable cause. The officers had reason to discount Jefferson's comments in light of Jefferson's friendship with DiNicola and his apparent unwillingness to incriminate DiNicola for fear of retaliation.

The Court also acknowledges that there was no physical evidence tying DiNicola to Sweet's car, despite the officers' belief that DiNicola might have taken Sweet's car to the McCreary Roofing Company to obtain the solvent. Nevertheless, the absence of physical evidence tying DiNicola to Sweet's car does not conclusively preclude the possibility of his having obtained accelerant by other means. The officers were aware that the accelerant used in the fire was identified as "stoddard solvent." They were aware that this substance was kept on hand at the McCreary Roofing Company, six blocks away, where both Jefferson and DiNicola worked. Despite the officers' inability to pinpoint the immediate source of the accelerant, there was sufficient evidence on the whole to warrant a prudent belief that DiNicola had set the fire. In fact, we do not think a contrary finding (that is, a *lack* of probable cause) would be reasonable on this record.

### (iv) *Plaintiff's Arguments Regarding Probable Cause*

Prior to arresting DiNicola, DiPaolo and Gunter had obtained an arrest warrant by submitting to the district justice an affidavit in support of a finding of probable cause (hereinafter, the "Affidavit of Probable Cause" or "Affidavit"). This Affidavit of Probable Cause has been a prime focus of attack by DiNicola. He contends that DiPaolo and Gunter are not entitled to summary judgment because genuine issues of material fact exist as to whether the Affidavit of Probable Cause contained false and misleading information. DiNicola contends that, if the false and misleading information is properly redacted (or otherwise made accurate), the Affidavit does not establish probable cause for his arrest and prosecution.

■ We think this argument misses the mark in that it focuses only on the information contained in the officers' Affidavit, as opposed to the totality of information known to them. Plaintiff's argument appears to be premised on the assumption that an arrest warrant was required in order to render his arrest and detention lawful. We have previously concluded, however, that no warrant was technically necessary for Fourth Amendment purposes because it is uncontroverted that the officers' entry into DiNicola's home on the day of his arrest was consensual. Accordingly, we view DiNicola's arrest as a warrantless arrest which was lawful because, on the record as a whole, there was probable cause as a matter of law to support it. And, because we conclude that there was probable cause as a matter of law, even independent of the "false and misleading" information upon which the officers allegedly relied, it follows that the allegedly "false and misleading" information in the officers' Affidavit could not have been material to DiNicola's arrest and prosecution.

Although we discuss Plaintiff's objections to the Affidavit in Part B, *infra*, we highlight here some of his major arguments about the evidence as it relates to probable cause. Chiefly, DiNicola contends that Sweet's hypnosis was deliberately undertaken with the purpose and effect of implanting a new, false memory implicating him as the perpetrator of the fire. He maintains that the hypnotic regression was highly suggestive and that it irreparably tainted Sweet's recollection such that her statement under hypnosis, and memory thereafter, were rendered unreliable. For present purposes we will allow Plaintiff the benefit of the doubt and assume that Sweet's hypnotically induced statement was indeed tainted and, therefore, of dubious reliability. Nevertheless, even disregarding that statement in its entirety, we would find that probable cause exists as a matter of law on this record.

■ Plaintiff claims that probable cause cannot be established without several evidentiary facts contained in Sweet's hypnotic statement: i.e., Sweet's specific recollection of hearing DiNicola leave her apartment, her recollection of being awakened by the sound of DiNicola moving around in the apartment, and her recollection of seeing DiNicola standing in the doorway to the den area staring at the fire. Unlike Plaintiff, we do not view Sweet's hypnotic statement as essential to a finding of probable cause. The mere fact that Sweet did not specifically recall hearing DiNicola leave her apartment during her September 6, 1979 interview does not, as a

factual matter, preclude the possibility of his having done so.[21] And, although Sweet in her September 6, 1979 statement did not specifically recount awakening to the sound of DiNicola moving about in her apartment, she did recount (i) being in bed with Jefferson, (ii) hearing DiNicola moving about and causing a "racket" in her apartment prior to the fire and (iii) being alerted to the fire and seeing DiNicola running around the apartment. Further, the fact that Sweet in her September 6 statement did not recall seeing DiNicola standing over the fire does not significantly undermine a finding of probable cause. Based on the evidence outlined above, there was sufficient circumstantial evidence from which reasonably prudent officers could have concluded that DiNicola had the knowledge and opportunity to start the fire.

■ Plaintiff also suggests that the contents of Sweet's September 6, 1979 statement undermine a finding of probable cause in that the statement is "exculpatory," "entirely benign as to Plaintiff" and "entirely inconsistent with her statements made under hypnosis." (Pl.'s Br. at 6, 9.) Having carefully reviewed both Sweet's September 6 and September 17 statements, we cannot agree with this characterization of the evidence. Nevertheless, we consider the September 6 statement (such as it is) for purposes of our probable cause analysis. We further consider the fact that Sweet's memory was impaired to some extent due to her intoxication and that many details of the night eluded her in her September 6 statement. Taking these factors into account. Sweet's September 6 statement nonetheless established that she and Jefferson were accounted for at the time the fire broke out, whereas DiNicola was not; that she and Jefferson heard DiNicola "fum-

bling around" in the apartment and making a "racket" prior to the outbreak of the fire; that she, Jefferson and DiNicola had all smoked marijuana that evening; and that DiNicola was described by Jefferson as having "been taking stuff all day" and being "pretty screwed up." In addition, Sweet in her September 6 statement described DiNicola as a "weird person," and clearly indicated that she had not trusted him being around her stereo or her purse on the night of the fire. Thus, we do not agree that this statement was entirely "benign" as to DiNicola or otherwise exculpatory. And, although Plaintiff characterizes Sweet's September 6 statement as an "inaccurate" account, we are unaware (and Plaintiff does not specify) in what regard the statement can be considered inaccurate. In sum, our reading of Sweet's September 6, 1979 statement is consistent with a finding that the officers had probable cause to believe DiNicola had set the fire.

Plaintiff also suggests that Jefferson's accounts of the evening contradicted Sweet's in two respects: "Jefferson had excluded the possibility that plaintiff left the residence prior to the fire or that he was discovered standing and staring at the fire." (Pl.'s Br. in Opp. at 14.) Having carefully reviewed the record in this regard, we do not agree that Jefferson's statements excluded the possibility that DiNicola left the residence prior to the fire. Indeed, in his various statements to the police, Jefferson represented that he had dozed off prior to the fire and woke up after it had been started. It is hard to understand how Jefferson's account precludes the possibility of DiNicola having left the apartment when, undisputedly, Jefferson had fallen asleep for a period of time prior to

---

**21.** Although Sweet's September 6, 1979 statement is not entirely clear on the point, there is evidence of record to suggest that both Sweet and Jefferson fell asleep briefly prior to the outbreak of the fire. Jefferson's statement of September 12, 1979 suggests that he and Sweet were both awakened by DiNicola "banging into everything" in the apartment. Further, while Sweet's September 6 statement does not specifically recount that she fell asleep, there appears to be a time lag not accounted for in her statement. A fair reading of her statement is not inconsistent with the possibility that she fell asleep for some

period of time. ("I just hear this racket going on, you know, like there's this fumbling around, and it was bugging me. Next thing I know I smelled smoke and Mike jumped up, I don't even know if he ever finished making love to me. Mike jumped up. I smelled smoke, thought I smelled smoke ... Sat up and it was like, Oh my God ...") (Pl.'s Ex. E at 17.) Plaintiff himself interprets Sweet's September 6 statement as establishing "Sweet's recollection that she, plaintiff and Jefferson evacuated the building after being awakened by the fire." (Pl.'s Br. at 11.)

the fire.[22] And, insofar as Jefferson's account contradicted Sweet's hypnotic recollection of seeing DiNicola standing and staring at the fire, this discrepancy is irrelevant for present purposes. As previously indicated, the Court has discounted Sweet's hypnotically induced statement in its entirety for purposes of its probable cause analysis. In short, having carefully reviewed the statements of Jefferson as well as the September 6, 1979 statement of Sweet, the Court remains unpersuaded that the record could reasonably support a finding of no probable cause.[23]

DiNicola next suggests that DiPaolo and Gunter failed to conduct an adequate investigation into the possibilities that either (a) the fire was accidental, or (b) another individual was responsible for starting it. With regard to the first point, the record here would not support a conclusion that the officers failed to adequately exclude the possibility of an accidental fire. It is undisputed that the state police fire marshals ruled the fire an arson and found direct physical evidence that an accelerant had been used in the fire. It was also undisputed that the fire originated *inside* Sweet's apartment, as opposed to outside the house near, e.g. the electrical box. Following DiNicola's suggestion, DiPaolo and Gunter asked the fire marshals to inspect the

area in the living room around the stereo. There, they found no evidence of an electrical fire, but did find evidence that accelerant had been poured on the stereo cabinet. DiPaolo and Gunter also looked into the possibility of a gas leak, but there was no evidence to suggest that this was in fact the cause of the fire. Plaintiff does not point to any evidence that would seriously indicate a possibility that the fire was accidental.[24]

■ Plaintiff also accuses DiPaolo and Gunter of concealing evidence that several witnesses allegedly observed another man running from the scene of the fire. The Court has thoroughly reviewed the evidence pertaining to this allegation and finds that, when viewed in the context of the entire record, it does not give rise to a material issue of fact on the issue of probable cause. Plaintiff relies in part on evidence from an in-camera hearing that was held before Judge Robert Walker on February 18, 1993 in connection with Plaintiff's second criminal trial. At the hearing, the prosecutors advised Judge Walker that then special prosecutor Ernest DiSantis had had a recent conversation with Gunter about the investigation of the fire. As paraphrased by the prosecutor, Gunter had remarked:

> that during the early part of the investigation in August of 1979, shortly after the

---

**22.** In making the claim that Jefferson's statement "excluded the possibility that plaintiff left the residence prior to the fire," DiNicola cites to the record at Def.s' App., Vol. V, 2053a (Bates No. 000768a). (Pl.'s Br. in Opp. at 14.) The Court has reviewed that citation and finds nothing therein which supports DiNicola's representation. Further, based on its own independent review of the record, the Court is unaware of any statement by Jefferson which definitively precludes the possibility that DiNicola left and returned to Sweet's apartment on the night of the fire.

**23.** DiNicola notes Jefferson's testimony at his first criminal trial that "you people got the wrong guy." (Pl.'s Br. in Opp. at 14, citing Def.s' App. 4045a.) This comment is obviously irrelevant to the issue of Plaintiff's arrest, since it was not made until months after the arrest. Further, we do not consider the statement to be terribly significant in terms of undermining probable cause for DiNicola's on-going prosecution. First, nothing in the criminal investigation file suggests that Jefferson actually witnessed the fire or saw the perpetrator first hand. Second, to the

extent that Jefferson made any comments exculpatory of DiNicola, DiPaolo and Gunter had reason to discount them in light of Jefferson's friendship with DiNicola and his apparent unwillingness to incriminate DiNicola for fear of retaliation.

**24.** In adjudicating DiNicola's appeal from his 1980 conviction, the Pennsylvania Supreme Court found that the evidence at trial was sufficient to establish that the fire was of incendiary origin:

> [Two Pennsylvania State Police Fire Marshals] testified ... that their investigation ruled out an electrical origin for the fire, and it was stipulated that there was no gas leak. Although DiNicola argues that lighted candles which were burning may have started the fire, such an origin would not explain the fire marshals' finding that an accelerant was used to kindle the fire. Thus, there was clearly sufficient evidence upon which the jury could have determined that the fire was of incendiary origin.

*Commonwealth v. DiNicola*, 468 A.2d at 1080 (reversing conviction on other grounds).

deaths of the three victims involved, an investigation was done in the neighborhood of the victim's house.

And, a person or persons were interviewed across the street from the victim's house, and one of the persons interviewed believed that they had seen sparks or something coming out the side of the house, possibly near the electric box.

And also, this person or persons disclosed that they believe they saw a tall thin person outside of the house at some time before, after or simultaneously with the electric sparks.

Detective Gunter was discussing this and questioned whether or not that had ever appeared in the police reports that had been compiled in this case....

(Def.'s App., Vol. VIII at 3784a–85a.) Upon further discussion with the prosecutors, Gunter believed that the witness in question may have been a neighbor by the name of Charles Mello. Although the criminal investigation file contains a report of the officers' interview with Mr. Mello, there is no mention in the report about sparks near an electrical box or a tall, thin person outside of Sweet's apartment. In any event, however, the transcript of the hearing before Judge Walker indicates that Gunter felt this account of a man near the electrical box was probably "bad information." (Def.s' App., Vol. VIII at 3786a.) This conclusion would appear to be supported by the fire marshals' undisputed determination that the blaze originated *inside* Sweet's apartment and was incendiary, as opposed to electrical, in nature. For the reasons previously discussed, the record shows that DiPaolo and Gunter adequately ruled out the possibility of an electrical fire in the course of their investigation, and any

inference to the contrary is not reasonably supportable on this record. Consequently, the evidence on which Plaintiff relies does not in any way alter our conclusion that the officers' had probable cause to believe DiNicola had set the fire.[25]

Plaintiff has also presented an affidavit from one Rose Martin (nee Rose Jaraczewski) in which Mrs. Martin states that she and her husband (then boyfriend) had observed a tall man with dark hair running from the north side of Sweet's house in a southerly direction carrying "what appeared to be a gas can" shortly before the fire broke out. (Pl.'s App. Vol. III, tab S, Martin Aff. at ¶ 4.) Mrs. Martin further states that, on the second day after the fire, two plainclothes police officers came to see her. She allegedly told them what she had seen and then sent the officers to talk with her boyfriend. (*Id.* at ¶ 5.) Plaintiff also has submitted a copy of DiPaolo's rough notes from various interviews. These notes contain a notation that "Rosemary" and "Rick Martin" were in a car from approximately 11:00 p.m. to 1:00 a.m. There is a further notation below their names: "Dark blue shirt w/m 20s? Rolling around in grass." (Pl.'s App. Vol. III, Ex. T.) Finally, Plaintiff points to the officers' police reports indicating that two witnesses had heard Pete Moore make threatening statements to Cora Jefferson due to his jealously over Cora's new boyfriend, Eugene Pitts.[26] Based upon this collective evidence, Plaintiff contends that there is a material issue of fact as to whether DiPaolo and Gunter knew "that others had a stronger motive, superior access and greater opportunity to start the fire." (Pl.'s Br. in Opp. at 15.)

When this evidence is viewed in the light most favorable to Plaintiff, it supports an

---

**25.** We also note that the criminal file contains a signed statement from Mr. Mello as to the events he witnessed on the night of the fire. Although barely legible, the statement (as best we can tell) does not mention a sighting of a man near the electrical box at Sweet's apartment. (*See* Def.s' App., Vol. V at 2025a–26a.)

**26.** Plaintiff represents that two witnesses observed Pete Moore "threaten to burn the house down because he was jealous of Cora Jefferson's plans to marry Eugene Pitt." (Pl.'s Br. in Opp. at 19, citing to the record at Def.'s App. Vol. V, 2054a, Bates No. 000769.) The Court has re-

viewed this citation and notes that it contains the officers' report of interview witnesses with Evelyn Wyncoop and Judith Pristello, both of whom had previously heard Pete Moore threaten to prevent Cora Jefferson's wedding to Eugene Pitts. (The Court has previously discussed these reports in Part A, section (ii), outlining the evidence in the criminal investigation file.) Notably, however, there is no mention whatsoever of Moore threatening to "burn the house down." (*See* Def.'s App. Vol. V at 2054a, Bates No. 000769.)

inference that at least one witness to the fire believed she saw a man running from the vicinity of Sweet's apartment at or shortly before the time of the fire carrying something that appeared to look like a gas can.[27] Nevertheless, the significance of this evidence must be considered in light of the entire record, as viewed by an objectively prudent person. DiPaolo and Gunter were aware of DiNicola's presence in the apartment, and especially his close proximity (both spatially and temporally) to the fire. They were aware of several arguably suspicious statements that he had made over the course of several interviews, including statements revealing his knowledge about fires. Certain portions of his factual account appeared to be contradicted and therefore specious. The officers were also aware that DiNicola had reportedly failed and/or undermined his polygraph exam. And, further, they knew that he had some access to the type of commercial solvent utilized in the fire. At the same time, DiPaolo and Gunter had investigated a number of leads as to other possible suspects, most notably Pete Moore, none of which pointed obviously to any individual other than DiNicola. In sum, the probative value of Mrs. Martin's statement, like any other piece of evidence, necessarily depends on the degree to which it tends to be corroborated by other reliable evidence in the record. We have already discussed the physical implausibility (though not impossibility) of another individual gaining entry to Sweet's apartment, spreading solvent about the apartment, and escaping undetected. Likewise, we have noted the extreme fortuity of DiNicola's own escape under such circumstances. When all of these factors are considered, coupled with Mrs. Martin's apparent lack of certainty as to what the alleged fleeing man was actually carrying, we are unpersuaded that this information creates a material issue of fact on the issue of probable cause.[28] In short, the record as a whole does not support Plaintiff's assertion that there were other plausible suspects with a "stronger motive, superior access and greater opportunity to start the fire."

■ To the extent, then, that Plaintiff's Fourth Amendment claim is premised upon the contention that DiPaolo and Gunter undertook a constitutionally deficient investigation, we find the evidence insufficient to support this claim. Plaintiff refers the Court to several cases in support of the proposition that "officers have a duty to investigate particularly where ... probable cause is lacking and other exculpatory evidence is readily available." (Pl.'s Br. in Opp. at 17–18.) *See Clipper v. Takoma Park, Md.,* 876 F.2d 17, 19–20 (4th Cir.1989) (probable cause did not exist for arrest of suspect in bank robbery case where officer failed to interview individuals called to his attention by suspect who would have established alibi, principal investigating officer testified that another officer who had been on scene told him he was not sure that suspect was robber, and police did not look at surveillance film from bank), *reh'g denied,* 898 F.2d 18 (4th Cir.1989); *Sevigny v. Dicksey,* 846 F.2d 953, 957–58 (4th Cir. 1988) (officer did not have a reasonable basis for warrantless arrest of mother for damage to property under the theory that mother herself had run car into garage, which was inconsistent with mother's statement that her child had done so, where officer failed to avail himself of readily available information, such as making rudimentary inquiries of neighbors then on the scene who would have verified mother's assertion that her child, not she, had done the property damage); *BeVier v. Hucal,* 806 F.2d 123, 126–27 (7th Cir.1986) (where police had arrested parents for child neglect under Illinois law, which required a showing of knowing or willful neglect by the parent, officers acted unreasonably in failing to question parents, babysitter, or any other witnesses at the scene of arrest, even though this information would readily have provided evidence as to parents knowledge); *Moore v.*

---

**27.** Despite Mrs. Martin's representation that her husband also witnessed a man fleeing the scene of the fire, we note that Mr. Martin has not presented any affidavit attesting to this fact.

**28.** We also note incidentally that DiPaolo's contemporaneous investigation notes reflect information about a young man rolling around in the grass. This information does not correspond to or corroborate Mrs. Martin's professed sighting as set forth in her affidavit, which she generated almost eighteen years after the fire.

*The Marketplace Restaurant,* 754 F.2d 1336, 1345 (7th Cir.1985) (police did not have probable cause to arrest plaintiffs for allegedly failing to pay their check at restaurant where plaintiffs were arrested at home immediately upon admitting that they had been at the restaurant that evening; police had failed to ask any further questions of the plaintiffs even though plaintiffs were not fleeing the scene, were not dangerous, and no serious crime had taken place).

The Court has reviewed these cases and finds them to be factually distinguishable in material respect from the circumstances here. Unlike the cases cited by DiNicola, probable cause was not lacking on this record. The Seventh Circuit, which decided *BeVier* and *Moore,* has held that there is no general duty on the part of a police officer to investigate further after acquiring information sufficient to establish probable cause. *See Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 437–42 (7th Cir.1986), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987). *See also Orsatti v. New Jersey State Police,* 71 F.3d 480, 484 (3d Cir.1995) (for purposes of assessing whether officers had "probable cause" court focuses on the information that officers had available to them at the time of their alleged unlawful conduct, "not on whether the information resulted from exemplary police work.").

Finally, Plaintiff asserts that DiPaolo and Gunter deliberately procured false testimony from Edwards to buttress their case in the second criminal trial. It goes without saying that, since Edwards's testimony was not available at the time of DiNicola's arrest, it is immaterial to his false arrest claim. Insofar as Plaintiff's malicious prosecution claim is concerned, the evidence presented by Edwards merely supplemented the case against him and was not critical in order to establish probable cause for his continued prosecution. Therefore, we may discount Edwards's statements in their entirety without altering our conclusion that DiPaolo and Gunter had probable cause to support their conduct.

Based on the information available to DiPaolo and Gunter over the course of their investigation, we find that they had probable cause as a matter of law to support their arrest of DiNicola and the institution of criminal charges against him. We arrive at this conclusion independently of Sweet's hypnotically induced statement of September 17, 1979 and specifically taking into account her September 6, 1979 statement, the statements of Michael Jefferson, and the information about alleged sightings of another man at the scene of the fire. Because the record here would not reasonably support a finding that DiPaolo and Gunter *lacked* probable cause, Plaintiff's false arrest, false imprisonment, and malicious prosecution claims cannot survive summary judgment.

### B.

▇▇▇▇ In the alternative, the Court concludes that DiPaolo and Gunter would be entitled to summary judgment under the doctrine of qualified immunity. Pursuant to the Supreme Court's ruling in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials performing discretionary functions are generally shielded from liability for civil damages to the extent that their conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Id.,* 457 U.S. at 818, 102 S.Ct. 2727 (citations omitted). We assume that, during the relevant time frame here, it was clearly unconstitutional to effectuate an arrest or institute criminal proceedings in the absence of probable cause to believe the accused had committed a crime. Nevertheless, qualified immunity would protect DiPaolo and Gunter from liability unless " 'on an objective basis, it is obvious that no reasonably competent officer would have concluded that' probable cause existed" for DiNicola's arrest and prosecution. *Radich v. Goode,* 886 F.2d 1391, 1395 (3d Cir.1989) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The Court finds, based upon the evidence previously outlined, that DiPaolo and Gunter had sufficient evidence inculpatory of DiNicola such that reasonably competent officers in their position could well have believed that probable cause existed for the arrest and prosecution.

▇▇▇ Plaintiff contends that the doctrine of qualified immunity is inapplicable where

officers have procured a warrant through false and misleading information. We have previously opined that, due to the officers' consensual entry into DiNicola's house on the morning of his arrest, no warrant was technically required. We now specifically conclude that, even if a warrant *was* required to effectuate a lawful arrest of DiNicola, DiPaolo and Gunter would be entitled to qualified immunity because reasonably well-trained officers in their position could have believed that the Affidavit of Probable Cause was not materially misleading and that it adequately supported a showing of probable cause.[29]

The Affidavit of Probable Cause, in its entirety, states as follows:

[1] On August 31, 1979 at 10:30 A.M. Erie Fire Department Fire Marshall [sic], John Kucinski, who is known to me and whose reliability 1 preseume [sic] because of his position, informed me that on August 31, 1979, at 622 West 16th Street, the following people, Alisa Nadine Minton, date of birth 9/23/70; David Geoffrey Sweet, date of birth 12/24/74; and Francis Eugene Pitts, Jr., date of birth 3/14/36, perished in a fire which had occurred at that location.

[2] On September 1, 1979, Erie County Coroner Merle Wood, who is known to me and whose reliability 1 presume because of his position, informed me that Pathologist Henry Lara, M.D., determined after autopsy that the said Alisa Nadine Minton died as a result of severe burns and smoke inhalation, and the said David Geoffrey Sweet died as the result of severe burns and smoke inhalation. The said Coroner Wood further stated to me that Pathologist Dr. Eisenberg, M.D., determined after autopsy that Francis Eugene Pitts, Jr., died of severe burns and smoke inhalation.

[3] On August 31, 1979, your affiant was told by State Police Fire Marshall Rodger [sic] C. Bellotti, who is known to me and whose reliability 1 presume because of his position as a State Police Officer, that he had investigated the fire and determined from the burn pattern observed that a flammable liquid had been applied to the flooring in the living room and den areas at 622 West 16th Street, and that therefore the fire at that location was of an incendiary origin.

[4] Your affiant personally witnessed on August 31, 1979 and September 5, 1979 Troopers Bellotti and May, of the Pennsylvania State Police, remove flooring samples of the living room and den areas of 622 West 16th Street.

[5] Your affiant was advised by the said Troopers that the said flooring samples were turned over to Criminalist Anthony M. Balut of the Pennsylvania Police Crime Lab.

[6] Your affiant's police investigation revealed that Stoddard Solvent is sold by United Refining Company to commercial establishments only, and only in 55 gallon quantities.

[7] On or about September 8, 1979, Detective Don Gunter, EPD, spoke with Mr. McCreary of McCreary Roofing Company, 1909 Chestnut Street. Mr. McCreary advised your affiant at that time that his company used Stoddard Solvent in its operations and was using it on the date of the fire and prior thereto.

[8] Your affiant was advised by Fire Marshall [sic] John Kucinski that he obtained samples of said solvent from McCreary Roofing Company and took it on September 6, 1979 to the Pennsylvania State Police Laboratory for comparison by Criminalist Balut with the above mentioned flooring samples which had been secured from the residence at 622 West 16th Street.

[9] Your affiant was advised by State Police Criminalist Anthony M. Balut on

---

**29.** This inquiry differs slightly from the analysis undertaken in Part A, *supra*. Under Part A, the Court treated DiNicola's arrest as a warrantless arrest and considered the probable cause inquiry in light of the *totality of evidence* known by DiPaolo and Gunter, whether or not that evidence was ultimately included in the officers' Affidavit of Probable Cause. For purposes of the present analysis, we assume that a warrant *was* required and, accordingly, we consider only that evidence which relates to the information set forth in the officers' Affidavit. Thus, we do not consider, e.g., DiNicola's arguably incriminating remarks or the results of his polygraph examination.

September 7, 1979 that he had analyzed samples of flooring from the areas of the den and living room at 622 West 16th Street and compared them with solvent samples from McCreary Roofing Company, provided him by Kucinski on September 6, 1979, and had determined that the floor samples contained hydrocarbons identical to Stoddard Solvent, a combustible liquid. Your affiant has personal familiarity with the reputation of Criminalist Balut as an expert and his reliability as a member of the State Police is presumed by your affiant.

[10] On or about September 8, 1979, your affiant was advised by Mr. McCreary that the defendant, Louis DiNicola, was employed by McCreary Roofing on the date of the fire and prior thereto and did have access to Stoddard Solvent as a consequence of his employment there.

[11] Your affiant first spoke with Michael Jefferson at the scene of the fire at 622 West 16th Street on August 31, 1979 at approximately 11:00 A.M. The said Michael Jefferson stated to your affiant that he was present at 622 West 16th Street at the time the fire erupted at approximately 12:00 midnight on August 30, 1979.

[12] Your affiant first spoke with Louis DiNicola on August 31, 1979 at approximately 1:30 P.M. at DiNicola's job site in the 1600 block of East 12th Street. DiNicola stated to your affiant that he was present at 622 West 16th Street at the time the fire erupted at approximately 12:00 midnight on August 30, 1979. DiNicola further stated to your affiant that he was asleep in the southwest living room when the fire broke out.

[13] Your affiant first spoke with Deborah Sweet on September 6, 1979. She stated to your affiant that she was present at 622 West 16th Street at the time the fire erupted at approximately 12:00 midnight on August 30, 1979. She further stated that she was asleep in the northwest bedroom with Michael Jefferson when the fire broke out.

[14] At the time your affiant spoke with Michael Jefferson on August 31, 1979, the said Michael Jefferson stated to him that he was asleep in the northwest bedroom with Deborah Sweet when the fire broke out.

[15] On September 6, 1979, Deborah Sweet stated to your affiant that at approximately 11:00 P.M., just prior to the fire, she heard Louis DiNicola leave the residence and then she fell asleep. She further stated she later awoke, heard someone in the den area, smelled smoke, got up and saw Louis DiNicola in the doorway to the den facing the den, and the den and living room area were in flames.

[16] Deborah Sweet, who was present at the time of the fire, is the mother of the two children who were victims in the fire, and was the renter of the premises where the fire occurred. Your affiant knows of no motive or reason for her to participate in this crime or give false testimony in this matter.

[17] Michael Jefferson resided upstairs in the residence at 622 West 16th Street with his mother, and his statements have been independently corroborated by Deborah Sweet. Your affiant knows of no motive or reason for him to participate in this crime or give false testimony on this matter.

[18] Both Deborah Sweet and Michael Jefferson have independently and separately given statements to your affiant. The statements they gave to your affiant are substantially similar and each corroborates and substantiates the other, particularly in terms of who was present, where the parties were located, and what occurred prior to and during the fire.

[19] All of the facts set forth herein were obtained by your affiant through personal interviews, official reports, and personal observations made by him during the course of his investigation to this offense.

[20] Based upon your affiant's investigation of this incident, your affiant believes that Louis DiNicola did have the opportunity as well as the ability to commit the crimes with which he has been charged, and that from the facts set forth herein was in fact the only one who could have committed the said crimes, and that the evidence as set forth herein is reliable,

credible and sufficient to establish probable cause for the issuance of the warrant requested.

> [Sworn to and Signed by DiPaolo and Gunter]

(Pl.'s App, Ex. A.)

DiNicola's objections to the Affidavit focus on Paragraphs 15 through 18 and Paragraph 20. Specifically, he contends that DiPaolo and Gunter materially tainted the Affidavit in the following manner:

(1) the defendants deliberately and intentionally suppressed and withheld evidence that Deborah Sweet had on September 6, 1979 given a statement ... to the police which was exculpatory as to the plaintiff and which was entirely inconsistent with her statements made under hypnosis on September 17, 1979;

(2) the defendants misrepresented that the supposed inculpatory statements of Sweet were given on September 6;

(3) the defendants subjected Sweet to a highly suggestive and improper hypnosis procedure which caused her to adopt false memories of the events in question;

(4) the defendants concealed both the fact of the hypnosis *and* the improper hypnotic procedure in which they and their agents engaged; [30]

(5) the defendants falsely stated that they had no reason to believe that Sweet was being dishonest, when they had full and sufficient reason to know that she had given *exculpatory* information as to the plaintiff and that she had been subjected to suggestive hypnosis designed to create a false memory;

(6) the defendants falsely stated that another witness, Michael Jefferson, had corroborated Sweet when in fact his statements did not corroborate any factual assertion tying plaintiff to the fire;

(7) the defendants falsely stated that the plaintiff was the only one who could have committed the crime while concealing for fourteen years the fact that no less than four witnesses observed another man running from the scene of the fire.

\*　　\*　　\*　　\*　　\*　　\*

(Pl.'s Br. in Opp. to Summ. Judg. at 6–7.)

 In the context of officers seeking an arrest warrant, qualified immunity applies unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In cases where it is alleged that an arrest or prosecution was procured through false and misleading information, it is the plaintiff's burden to satisfy the two-part test set forth in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), viz.:

---

**30.** It appears, based on oral argument and a review of Plaintiff's brief, that Plaintiff is asserting a separate Fourteenth Amendment due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) based upon the Defendants' alleged purposeful concealment of the circumstances of Sweet's hypnosis. To the extent such a claim is being advanced, it cannot survive summary judgment. Police officers satisfy their constitutional obligations under *Brady* when potential *"Brady"* material is disclosed to the prosecutor; it is not incumbent upon police officers to disclose potential exculpatory information to the defendant directly. *See McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir.1996); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir.1992), *cert. denied*, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir.1988). Here, the record clearly establishes that the prosecutors in Plaintiff's first criminal trial were aware of Sweet's hypnosis on September 17, 1979, as well as her pre-hypnotic statement given on September 6, 1979. Plaintiff objects that, while the prosecutors were aware of Sweet's hypnosis, they could not have appreciated the suggestive nature of the regression because it is not clear that the prosecutors listened to the tapes of Sweet's September 6 interview and because a transcript of the hypnotic regression was not produced to them until after DiNicola's arrest. Nevertheless, we do not think that the Fourteenth Amendment places the burden of such disclosure on the officers. It stands to reason that the audio tapes from Sweet's hypnotic regression must have been preserved, and therefore available to the prosecution, at least up until the time of their transcription. We are unaware of any reason why the audio tapes from Sweet's September 6 hospital interview would not have similarly been available to the prosecutors. And the record does not suggest that the existence of these materials was ever concealed from the prosecutors. Having made the prosecution aware of Sweet's hypnotic session, *Brady* required no more.

(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause.

*Sherwood v. Mulvihill,* 113 F.3d 396, 399 (3d Cir.1997) (addressing Fourth Amendment claim premised on allegedly unconstitutional search). *See also Whitmore v. Smith,* No. Civ. A. 96–2745, 1997 WL 438441 at *6 (E.D.Pa. July 30, 1997) (§ 1983 claim premised upon alleged unlawful arrest and prosecution). Unless the Plaintiff adduces sufficient evidence to establish both prongs, there is no constitutional violation at all and, hence, no need to address qualified immunity. *Sherwood,* 113 F.3d at 402. Even assuming that both prongs can be satisfied on the record, though, the question becomes whether it would necessarily have been clear to reasonably well-trained officers that the Affidavit could not pass constitutional muster.

(i) *The Alleged "Falsehoods"*

We will first address those aspects of Plaintiff's objections that bear on the issue of falsehoods in the Affidavit. Plaintiff objects that Defendants suppressed evidence that Sweet had given a statement on September 6, 1979 that was "exculpatory" as to Plaintiff and "entirely inconsistent" with her statements made under hypnosis on September 17, 1979. To the extent that Plaintiff characterizes Sweet's September 6, 1979 statement as "exculpatory," "entirely benign," "inaccurate" or "entirely inconsistent" with her hypnotically induced statement, the Court cannot entirely agree with this characterization. Accordingly, DiPaolo and Gunter were not constitutionally required to include such language in their Affidavit and the omission of such representations does not constitute a falsehood. We also cannot agree with Plaintiff's suggestion in his brief that Sweet had "virtually no recall" of the night of the fire, prior to hypnosis. While it is true that certain details of the night eluded her during her September 6 interview, that account speaks for itself and is in actuality fairly

detailed and illuminating and, to a large extent, corroborated by Jefferson's account. Thus, DiPaolo and Gunter were not constitutionally required to state in their Affidavit that Sweet had "virtually no recall" of the night of the fire and the omission of this representation similarly did not constitute a falsehood. Nevertheless, for purposes of our materiality analysis, *infra*, we will assume that a fair representation of the contents of the September 6, 1979 statement (such as they are) had been supplied in the Affidavit and made known to the reviewing district justice. Further, we will assume that the Affidavit had accurately revealed the fact that Sweet's statement of September 17 was given under hypnosis.

Plaintiff objects that the Affidavit incorrectly attributes contents of her September 17 hypnotic statement to the statement given on September 6, 1979. We will assume that this misstatement is corrected by revealing the fact that Sweet gave two different statements, one on September 6 and one under hypnotic regression on September 17. Further we will assume that the Affidavit had accurately reflected the discrepancies in the statements, including the fact that Sweet's September 6 statement did not contain a specific recollection of hearing DiNicola leave the apartment or the discovery of him standing and staring at the fire.

Plaintiff objects that DiPaolo and Gunter concealed in their Affidavit both the fact of hypnosis "and the improper hypnotic procedure in which they and their agents engaged." After careful review of the record, we do not believe that it supports a reasonable inference that DiPaolo and Gunter themselves participated in the hypnosis of Sweet or specifically directed the manner in which it was undertaken by Vorsheck. Thus, we do not consider the Affidavit false for failing to suggest that Vorsheck performed a suggestive hypnotic regression at the direction of DiPaolo and Gunter or with their participation.[31] Nevertheless, we will assume that the Affidavit should have revealed at least the fact of Sweet's hypnosis, such

---

31. And, for reasons explained below, the Court finds that it is conclusively bound by a prior determination that Vorsheck acted independent of the police in conducting the hypnosis.

that a reviewing magistrate would have been on notice of the arguable lack of reliability of her hypnotic regression.

Plaintiff next objects to the officers' representation in the Affidavit that they had no reason to believe that Sweet was being "dishonest" in her account of the night of the fire. He characterizes this representation as false, since DiPaolo and Gunter knew that Sweet's September 6 statement had been "exculpatory" and that her September 17 statement was the product of a suggestive hypnotic regression. Again, although we do not think the officers' failure to describe the September 6 statement as "exculpatory" was a falsehood by omission, we will presume that the fair contents of that statement had been disclosed to the reviewing district justice. Further, we do not consider the representation about Sweet's lack of dishonesty to be a falsehood, insofar as it relates to Sweet's non-hypnotic statement of September 6. Nevertheless, we will presume, as noted above, that the Affidavit disclosed the fact that Sweet's statement of September 17 was given under hypnosis such that a reviewing magistrate would be on notice of its potential lack of reliability.

Plaintiff further objects to the officers' representation that Jefferson had corroborated Sweet's statement when in fact his statements did not tie DiNicola directly to the fire. Paragraph 18 of the Affidavit states: "Both Deborah Sweet and Michael Jefferson have independently and separately given statements to your affiant. The statements they gave to your affiant are substantially similar and each corroborates and substantiates the other, particularly in terms of who was present, where the parties were located, and what occurred prior to and during the fire." (*See* Pl.'s App., Ex. A at ¶ 18.) Having carefully reviewed the statements of Jefferson and Sweet in some detail, the Court cannot say that Paragraph 18 constitutes a misrepresentation or falsehood because, in fact, Jefferson's and Sweet's statements did essentially corroborate one another, especially in terms of who was present and where they were located at the time of the fire. Nevertheless, we assume that the Affidavit accurately reflected the fact that Jefferson's

statements did not tie DiNicola directly to the fire in the sense of personally witnessing him setting it or hovering over it.

▮▮▮ Finally, DiNicola objects that DiPaolo and Gunter "falsely stated that the plaintiff was the only one who could have committed the crime while concealing for fourteen years the fact that no less than four witnesses observed another man running from the scene of the fire." (Pl.'s Br. in Opp. at 7.) Having undertaken an extensive review of the record on this point, this Court is not convinced that the officers' representation in Paragraph 20 can properly be considered a falsehood, either by commission or omission. For one, the representation on its face bespeaks an element of professional judgment on the part of the officers, based on everything they knew about the case. We have previously discussed the investigation in detail, including the evidence concerning statements of alleged sightings of another man at the scene of the fire. We have specifically found that this evidence does not reasonably support Plaintiff's assertion that "others had stronger motive, superior access and greater opportunity [than DiNicola] to start the fire." (Pl.'s Br. in Opp. at 15.) (Nor, incidentally, does it appear to be established of record that, in fact, *four* persons saw another man running from the scene of the fire or that the accounts were sufficiently alike to suggest that the witnesses all saw the same thing.) In sum, we do not consider the officers' representation to be a falsehood based on our extensive review of the record as a whole. At the very least, we think that reasonably competent officers in the position of DiPaolo and Gunter could have believed the representation in Paragraph 20 to be accurate, fair and truthful. Courts have recognized that, based on feasibility constraints and, based on the fact that the standard of establishing "probable cause" is lower than that required at trial to establish guilt "beyond a reasonable doubt," an affiant is not required to include in an affidavit of probable cause every piece of information gathered in the course of an investigation that might prove exculpatory. *See Mays v. City of Dayton,* 134 F.3d 809, 815–1 (6th Cir.1998) (rejecting inference that due process protections provided to defendants prior to trial under *Bra-*

*dy* applies to the warrant process under the guise of *Franks,* thereby entitled subject of a search warrant to disclosure of all potentially exculpatory information), *reh'g and petition for reh'g en banc denied; United States v. Colkley,* 899 F.2d 297, 302–03 (4th Cir.1990) ("[A] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process. The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded."). In sum, then, we do not consider the representation in Paragraph 20 of the Affidavit to be a falsehood, nor do we think that reasonably well-trained officers in the Defendants' position would have considered it such.

### (ii) *Materiality*

We next consider whether any of the alleged false omissions or misrepresentations in the Defendants' Affidavit were material. Falsehoods are deemed to be material to a finding of probable cause only if the affidavit, "with the . . . false material set to one side . . . is insufficient to establish probable cause." *Sherwood,* 113 F.3d at 399 (quoting *Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). In assessing the materiality of allegedly false information in an officer's affidavit, courts undertake the process of mentally excising the affirmative misrepresentations and supplying any information that was improperly omitted. The court then considers whether the affidavit, as corrected, establishes probable cause. *Sherwood,* 113 F.3d at 399–400.

For purposes of this exercise, we will assume that the Affidavit accurately reflected the contents of Sweet's September 6, 1979 statement, including the fact that Sweet was intoxicated on the night of the fire and could not remember certain details of that evening. Further, we will assume that the circumstances of Sweet's hypnotic statement had been disclosed such that a reviewing magistrate would have been on notice of its arguable lack of reliability. This, in effect, requires us to hypothetically disregard the assertions in Paragraph 15 of the Affidavit that Sweet a) heard DiNicola leave the apartment, and b) saw him standing and staring at the fire. We will also assume that the affidavit reflects the fair substance of Jefferson's account, including the fact that Jefferson did not witness him setting or standing over the fire.

Taking all of these hypothetical amendments into account, the Affidavit would nevertheless establish that the fire was incendiary in nature and had originated inside the house; that flammable liquid had been poured in the living room and den areas as a means of igniting the fire; that the solvent identified as the accelerant was available only commercially in 55 gallon drums; that DiNicola had access to the type of solvent used in the fire by virtue of his employment at McCreary Roofing Company; that DiNicola was present inside the house at the time the fire was set with knowledge of the danger posed to other individuals; that he was known to be in a location in the apartment where he could have set the fire; that he had been heard making noise in the apartment prior to the outbreak of the fire; that Sweet and Jefferson had fallen asleep in the same bedroom for some period of time prior to the outbreak of the fire; that the other occupants of the house were sufficiently accounted for so as to exclude them as suspects; and that three people died as a result of the fire. In addition, the Affidavit represented that the officers believed DiNicola had the opportunity and ability to set the fire and that, in their view, he was the only one who could have done it.

Viewing the "corrected" Affidavit in this light, the Court concludes that reasonably well-trained officers in the position of DiPaolo and Gunter could have believed that the Affidavit nevertheless established probable cause. Otherwise stated, reasonably competent officers in Defendants' position could have well believed that any misrepresentations and/or omissions in the Affidavit were not material to a finding of probable cause and that the Affidavit was therefore constitutionally sound. *See Malley v. Briggs,* 475 U.S. at 344–45, 106 S.Ct. 1092 (qualified

immunity applies unless it would have been clear to reasonably well-trained officers in the defendants' position that the affidavit failed to establish probable cause and that they should not have applied for the warrant under the circumstances).

Based on the foregoing, we find that Di-Paolo and Gunter are entitled to qualified immunity from any liability under 42 U.S.C. § 1983 stemming from their involvement in the arrest and prosecution of DiNicola. Accordingly, summary judgment will be entered in their favor.

### C.

We next address Plaintiff's § 1983 claims against Defendants Vorsheck and Edwards. To reiterate, under § 1983 DiNicola is required to show both a violation of his federal rights by these Defendants and that they committed the violation while acting under color of state law. *Kneipp v. Tedder*, 95 F.3d at 1204. Plaintiff seeks to tie Vorsheck into his Fourth Amendment claims under the theory that Vorsheck conspired with DiPaolo and Gunter to conduct a highly suggestive hypnosis of Sweet. The purpose and effect of this hypnosis, he claims, was to "conceal[ ] and forever destroy[ ] her exculpatory prehypnotic memory and replac[e] it with a hypnotically induced memory that caused her to become convinced that plaintiff set the fire." (Pl.'s Br. in Opp. at 1–2.) Essentially, Plaintiff theorizes that Vorsheck acted with Di-Paolo and Gunter to intentionally alter Sweet's memory in order to create incriminatory evidence against him. Plaintiff's claims against Edwards are premised on the theory that Edwards conspired with DiPaolo and Gunter to provide false testimony against Plaintiff in his second criminal trial.

In light of our prior conclusion that DiPaolo and Gunter had probable cause as a matter of law to effectuate DiNicola's arrest and prosecution, even independent of the evidence obtained from Edwards or from Sweet's hypnosis, these claims cannot survive summary judgment. We have already concluded that the existence of probable cause as a matter of law defeats Plaintiff's federal false arrest, false imprisonment and malicious prosecution claims. Thus, there is no basis for establishing that either Vorsheck or Edwards violated Plaintiff's Fourth Amendment rights.

Alternatively, we conclude that the claims against Vorsheck and Edwards fail because there is insufficient evidence to establish that either one acted "under color of state law." It is this latter point which we now address in more detail.

#### 1. *The Claims Against Vorsheck*

For purposes of § 1983, the "under color of state law" requirement has been treated as identical to the "state action" requirement under Fourteenth Amendment jurisprudence. *See United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966) (quoted in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) and *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)). In determining whether this standard is met, we essentially must inquire whether "there is a sufficiently close nexus between the State and the challenged action of [Defendants] so that the action of the latter may be fairly treated as that of the State itself." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir.1995) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995).

Plaintiff contends that Vorsheck meets the state action requirement under one of two theories. He first claims that Vorsheck, in conducting the hypnosis of Deborah Sweet as well as his own attempted hypnosis and questioning, was conducting a "public function." *See Mark*, 51 F.3d at 1142 (under the "public function" analysis, inquiry is whether "the private entity has exercised powers that are traditionally the exclusive prerogative of the state.") (citing *Blum*, 457 U.S. at 1004–05, 102 S.Ct. 2777). Alternatively, DiNicola alleges that Vorsheck "has acted with the help of or in concert with state officials." *Id.* (quoting *McKeesport Hosp. v. Accreditation Council for Graduate Med. Ed.*, 24 F.3d 519, 524 (3d Cir.1994)). This latter theory is premised upon the following central allegations:

a. that the police gave information to Vorsheck prior to Adams's hypnosis (First Amended Complaint ("FAC") ¶ 20) and instructed Vorsheck that DiNicola was the principal suspect and that the purpose of the hypnosis was to develop evidence against him (FAC at ¶ 21);

b. that the police participated and assisted in conducting the hypnosis (FAC ¶¶ 20–21);

c. that the hypnosis session was highly suggestive, involving the use of leading questions at the direction of the police, and was otherwise conducted in a manner contrary to generally accepted standards for the hypnosis of witnesses for forensic purposes (FAC ¶ 21);

d. that, as a result of the hypnosis, Adams adopted a new and false memory which was the product of the improper hypnosis (FAC ¶ 22);

e. that there was a plan and agreement among the Defendants to bring false criminal charges against DiNicola (FAC ¶ 22); and

f. that, in furtherance of the plan and agreement, the Defendants deliberately concealed the September 6, 1979 hospital interview of Adams which was inconsistent with the hypnotically induced statements secured on September 17, 1979 (FAC ¶ 22).

Vorsheck contends that, based on the doctrine of collateral estoppel, state action on his part cannot be established as a matter of law. Specifically, he relies on the September 24, 1984 opinion of the Hon. Fred B. Anthony, Erie County Court of Common Pleas, in which a judicial finding was made that Vorsheck acted independently of the police in conducting the hypnotic regression of Sweet. Vorsheck claims that this ruling precludes Plaintiff from establishing state action under either the conspiracy or public function theories.

Pursuant to 28 U.S.C. § 1738,[32] we are required to give the same preclusive effect to state court judgments as would be given by courts of the state from which the judgment originated. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 189 (3d Cir.1993). Pennsylvania courts apply the doctrine of collateral estoppel when five elements are met:

(1) the issue decided in the prior action is identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior action; (4) the party ... against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*Faison v. Sex Crimes Unit of Philadelphia,* 845 F.Supp. 1079, 1085–86 (E.D.Pa.1994) (citing *City of Pittsburgh v. Zoning Bd. of Adjustment,* 522 Pa. 44, 559 A.2d 896, 901 (1989)). It would appear that the only element of collateral estoppel which is arguably disputed here is that of "identity of issues." The Court will therefore focus on that particular requirement.

Following the vacation of Plaintiff's criminal conviction in 1983, the circumstances of Sweet's hypnosis came to light, resulting in additional pretrial proceedings in state court relative to Plaintiff's second criminal trial. Based in large part upon the uncovering of Sweet's hypnosis, DiNicola filed a motion to dismiss the criminal charges against him and/or to exclude the testimony of Deborah Sweet altogether in his second criminal trial. The Erie County Court of Common Pleas, Hon. Fred B. Anthony, held several days of evidentiary hearings on the motion during the months of June–August, 1984. Among other things, DiNicola argued that the hypnosis used on Ms. Sweet was so suggestive that it completely contaminated any recollection that Ms. Sweet may have had of the fire, whether pre- or post-hypnotic memories. While the state court agreed that Ms. Sweet's hypnotically induced memories were

---

**32.** Section 1738 provides that: "[J]udicial proceedings [of any court of any State] ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State." 28 U.S.C. § 1738.

unreliable, and therefore inadmissible, it declined to suppress certain portions of her testimony that were clearly made prior to hypnosis. The court acknowledged that the issue of whether Ms. Sweet's pre-hypnotically induced testimony would be admissible was controlled by *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (Pa.1984), wherein the Pennsylvania Supreme Court established the following standard:

> whenever a person previously hypnotized is offered as a witness, the offering party must so advise the court, and show that the testimony to be presented was established and existed previous to any hypnotic process; [ ] that the person conducting the hypnotic session must be trained in the process *and is neutral of any connection with the issue or the parties;* and, the trial judge shall instruct the jury that the testimony of a witness previously hypnotized should be carefully scrutinized and received with caution.

476 A.2d at 1308 (internal footnote omitted) (emphasis supplied).

Insofar as the neutrality of Vorsheck was concerned, Judge Anthony found, in relevant part, as follows:

> The fourth guideline [of *Smoyer*] requires that the hypnotist be "neutral of any connection with the issue or the parties". *Smoyer,* 476 A.2d at 1308. The court in *Smoyer* does not define these terms. In our research, we find that the term "neutral of any connection with … the parties" appears to be simply a variation of one of Dr. Orne's safeguards. One of his safeguards specified that the hypnotist "should be an independent professional not responsible to the prosecution or investigators." …
>
> Applying this standard, we find that Mr. Vorsheck was not under contract with nor was he an employee of any police or law enforcement agency. Of the thousands of hypnotisms that Mr. Vorsheck performed, only about thirty or fifty hypnotisms were performed for various police agencies between 1975 and 1979. Furthermore, of that number only about six or eight were performed for the City of Erie Police Department. As such, the services that Mr.

Vorsheck performed for the various law enforcement agencies were but a minuscule part of his practice, and do not give him the type of interest in the outcome of the hypnosis that would effect [sic] his neutrality.

> The term neutral of the issues appears to this Court to mean that the hypnotist must not have any connection with the event under investigation nor any substantial knowledge of the surrounding circumstances.

> \* \* \* \* \* \*

> In this case, Mr. Vorsheck did have some knowledge of the surrounding circumstances. The defendant had been brought to him about being hypnotized [ ] on September 10, 1979. So, Mr. Vorsheck did have some idea that the defendant was connected with the fire.

> Mr. Vorsheck claims that he cannot remember being told that the defendant was a suspect in the arson/murder. However in the Sweet regression, Mr. Vorsheck appeared to be centering on the defendant. He asked what the defendant was wearing… but never asked what Michael Jefferson was wearing, even though Mr. Jefferson was also with Ms. Sweet on the night of the fire.

> Mr. Vorsheck also seemed to be very concerned with what type of shoes or footwear that the defendant was wearing … He also brought up the subject whether Mr. Jefferson or the defendant made a pass at Ms. Sweet…. Both of these areas of questioning indicate that Mr. Vorsheck had more than a modicum of knowledge about the circumstances of the fire.

> These incidents, however, are isolated and are not part of an overall pattern of questioning. We do not find these instances to be so overwhelming to lead us to conclude that Mr. Vorsheck possessed such a degree of information as to foreclose him from being neutral to the issues.

(Mem. Op. dated 9/24/84 at 8, Def.'s App. of Evid. Materials in Supp. of the Mot. to Dismiss Complaint under Rule 12(b) [Doc. No. 17] at Ex. 10, p. 000500–502 (internal cita-

tions and footnote omitted).) In a footnote, Judge Anthony further stated the following:

> The defendant also presented the testimony of Thomas A. Martin, a friend of Ms. Sweet. He testified that he saw Detectives DiPaolo and Gunter come down from the upper floor of the Erie Institute of Hypnosis while Ms. Sweet was in an upper room being hypnotized. However, there were [sic] more than one room upstairs and Mr. Martin could not say where Ms. Sweet was being hypnotized. Further, both Mr. Vorsheck and Detective DiPaolo testified that DiPaolo and Gunter were not present in the room where the hypnosis occurred. Therefore, Mr. Martin's testimony is not sufficient to effect [sic] our finding that Mr. Vorsheck was neutral of the issues.

*Id.* On cross-appeal by both parties, the Pennsylvania Superior Court affirmed Judge Anthony's ruling. *See Commonwealth v. DiNicola,* 348 Pa.Super. 405, 502 A.2d 606 (Pa.Super.1985), *allocatur denied,* 516 Pa. 616, 531 A.2d 1118 (Pa.1987), and *cert. denied,* 484 U.S. 1028, 108 S.Ct. 755, 98 L.Ed.2d 768 (1988).

 Defendant Vorsheck argues that the foregoing ruling by Judge Anthony is binding on this Court and precludes Plaintiff from attempting to reassert Vorsheck's complicity with the police for purposes of establishing state action. We are inclined to agree. As is evident from the foregoing excerpts, DiNicola in the suppression hearing before Judge Anthony raised essentially the same arguments as are being raised here relative to Vorsheck's alleged lack of independence. Moreover, DiNicola now relies chiefly on the same evidence that was brought to the attention of Judge Anthony in challenging Vorsheck's neutrality—i.e. evidence from Thomas Martin that supposedly establishes DiPaolo's and Gunter's presence on the second floor where Sweet was being hypnotized, and examination of the transcript from Sweet's hypnosis which supposedly reveals Vorsheck's intimate knowledge of the details of the investigation.[33] Never-

theless, Judge Anthony specifically found that Vorsheck acted as a neutral professional in conducting the hypnosis of Sweet, both in terms of his relationship with the Erie police and in terms of his familiarity with the factual issues in the case. Indeed, Judge Anthony implicitly found that Vorsheck satisfied one of the specific safeguards annunciated by Dr. Orne, DiNicola's expert witness at the suppression hearing,—namely, that the hypnotist be "an independent professional not responsible to the prosecution or investigators." (Mem. Op. at 7, Def.'s App. Ex. 10 at 000500.) We acknowledge that Judge Anthony's analysis was framed in terms of whether the element of neutrality under *Smoyer* was met. Nevertheless, we do not see how Judge Anthony's ruling can be reconciled with a finding that Vorsheck conspired with the Erie Police to deprive DiNicola of his constitutional rights.

Nor can Judge Anthony's ruling be reconciled with a finding of state action under the public function analysis. Central to such a theory is Plaintiff's assertion that Vorsheck—knowing the importance of independence in conducting hypnosis—nevertheless abandoned all pretense of independence and became, at the behest of DiPaolo and Gunter, a surrogate police investigator. Stated differently, Plaintiff seems to allege that DiPaolo and Gunter enlisted Vorsheck to act as their agent in hypnotizing Sweet. However, this theory cannot be maintained in light of Judge Anthony's finding that Vorsheck conducted his hypnosis in a neutral fashion and that Vorsheck was not responsible to either the police or the prosecution. Adopting Plaintiff's theory in the context of this case (and in light of Judge Anthony's findings) would result in essentially a per se ruling that, any time a professional hypnotist conducts regression on a key witness, the hypnotist acts as an arm of the police, regardless whether or not the hypnotist acted as an independent professional. This Court is unwilling to extend the doctrine of state action that far.

---

**33.** To the extent that Plaintiff now relies on facts outside the scope of evidence presented to Judge Anthony, no showing has been made that such evidence is new and/or material evidence that was not previously available.

Because Plaintiff cannot establish that Vorsheck acted "under color of state law," Plaintiff's § 1983 claims against him fail as a matter of law. Moreover, because Plaintiff cannot establish on this record that Vorsheck acted in concert with, or at the direction of, the Erie Police Department, there is no evidence from which a reasonable conclusion could be drawn that Vorsheck was responsible in any way for the filing of criminal charges against DiNicola or for his arrest—even assuming no probable cause existed. Accordingly, Vorsheck is entitled to summary judgment on all of Plaintiff's Fourth Amendment claims, as well as his state law malicious prosecution claim.

### 2. The Claims Against Edwards

We next consider whether Edwards can be considered a state actor for purposes of § 1983. Plaintiff alleges that DiPaolo and Gunter actively recruited jailhouse informants, including Edwards, to give incriminating information against him with reckless indifference as to the truth or falsity of the information provided. Specifically he claims that, at the time of his second criminal trial, the prosecution pursued a theory that Plaintiff had set the fire in order to conceal an assault on Sweet's daughter. According to Plaintiff, Edwards was recruited by DiPaolo and Gunter to falsely attribute to him this new uncharged crime of assault, thereby buttressing the prosecution's motive theory.

In our Memorandum Opinion of January 9, 1996, the Court noted that the doctrine of witness immunity under *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), protected Edwards from any liability stemming from testimony provided in court or during court-related proceedings. (1/9/96 Mem. Op. at 20, n.5.) The Court therefore considers Plaintiff's allegations only insofar as they relate to out-of-court statements made by Edwards that were utilized as a basis for Plaintiff's continued prosecution.

Viewing the evidence of record in the light most favorable to DiNicola, we conclude that there is insufficient evidence from which a trier of fact could reasonably infer that Edwards acted under color of state law in pro-

viding his out-of-court statements against DiNicola. The Court has carefully reviewed the testimony concerning Edwards's involvement in the criminal case against DiNicola. Among other things, we have examined the parties' depositions, DiPaolo's testimony from the state court hearings held on August 30, 1984 and September 19, 1984, DiPaolo's testimony from Plaintiff's criminal trial in 1994, and Edwards's testimony from the 1994 criminal trial.

The evidence, when fairly construed in the light most favorable to DiNicola, shows that DiPaolo first came into contact with Edwards on June 24, 1983. On that date, DiPaolo was present in the Butler County District Attorney's office at the invitation of Millcreek police officers relative to a completely different criminal investigation. Toward the end of Edwards's interview with the police, Edwards, having recognized DiPaolo's name, commented that he knew DiNicola from the Western Penitentiary and that DiNicola had spoken of DiPaolo. At that time, both Edwards and DiNicola were incarcerated at Western Penitentiary in Pennsylvania. At a suppression hearing held on August 30, 1984, DiPaolo described the encounter as follows:

> . . . as we were leaving the District Attorney's office in Butler, Mr. Edwards at that time asked me what my name was again. I explained to him my name was DiPaolo and that I was from Erie. At that time, he stated to me that there was a friend of mine that was in Western that talks about me all the time because I was the [——] that put him away. At that time, he mentioned the name Louis DiNicola. He further stated that Mr. DiNicola is quite a character, that he is waiting any day for his new trial, that he is going to be granted—that he feels that he is going to beat it when it comes back up for Court. That was the extent of the conversation with myself and Mr. Edwards.

(Def.'s App. Vol. VII, at 3589a.) No further questioning occurred and DiPaolo did not attempt to persuade Edwards to acquire more information on DiNicola. It is undisputed that, at the time of this conversation,

DiNicola's conviction was on appeal but not yet been overturned.

In December 1983, the Pennsylvania Supreme Court vacated DiNicola's conviction and granted him a new trial. *See Commonwealth v. DiNicola*, 503 Pa. 90, 468 A.2d 1078 (Pa.1983). Following this development, DiPaolo contacted Edwards's wife for the purpose of establishing a meeting with Edwards and discussing any information that Edwards might have relative to DiNicola's case. DiPaolo arranged an interview, which was held on February 13, 1984 at the Allegheny County Police Department in Pittsburgh. During the meeting, Edwards gave a signed, written statement concerning certain inculpatory remarks that DiNicola had allegedly made concerning the fire. (See Def.'s App. Vol. III, at 1314a.) Edwards claimed that DiNicola had made these remarks in May 1983, and that he and DiNicola had engaged in many other conversations since that time. At one point, Edwards alleged that DiNicola had mentioned the name of a solvent that was used to start the fire. Edwards offered that he might be able to find out the name of the solvent from DiNicola. Edwards was advised that, if he was going to ask DiNicola any questions, he should first read DiNicola his Miranda rights.[34] However, Edwards was not requested to provide any further information. Nor was Edwards promised any reward or benefit for the information he had provided. Edwards did state, however, that if he were ever called to testify against DiNicola, he would need to be transferred to a different prison in order to ensure his personal safety.

Following this meeting, DiPaolo did not have further contact with Edwards until August 30, 1984.[35] On that date, Edwards was brought to Erie, apparently for the purpose of testifying in a suppression hearing. While in the Erie County District Attorney's office, Edwards provided additional inculpatory information against DiNicola which supplied a possible motive for DiNicola to start the fire. In particular, Edwards alleged that DiNicola had made a statement expressing remorse about the children's death, and explaining that he had been in a situation where he had to start the fire because of "the act" he had committed on one of the children. DiPaolo recorded the substance of this interview in a police report dated August 30, 1984. (*See* Def.'s App, Vol. V at 2183a.) The report notes that this second alleged conversation, like the earlier one, was initiated by DiNicola. (*Id.*) During the course of this August 30, 1984 interview, there was no mention by Edwards as to whether he hoped to gain anything from providing this information.

The Court finds, based on the foregoing information, that Defendant Edwards is entitled to summary judgment on Plaintiff's federal claims because there is insufficient evidence from which to conclude that Edwards acted under color of state law. There is no evidence that DiPaolo or Gunter ever directed Edwards to obtain information on their behalf, or supervised his conduct in any way. There is no evidence that Edwards acted as a paid informant in DiNicola's case or received remuneration for his statements. In fact, there is no evidence that Edwards ever received any tangible benefit or any promise of a benefit as consideration for the information he provided. In sum, the record does not lend itself to any reasonable inference that Edwards conspired with DiPaolo and Gunter to provide false information or otherwise acted at their direction or on their behalf.

Plaintiff has cited several circumstantial factors which he claims raise a genuine issue of fact as to Edwards's status as a

---

**34.** There appears to be some contradiction in the record regarding this point. DiPaolo testified at a 1984 suppression hearing that Gunter was present on February 13, 1984 and that it was Gunter who made the remark about providing Miranda warnings. However, at his deposition taken in 1997 in connection with this lawsuit, Gunter could not recall having met Edwards.

**35.** The record shows, however, that shortly after the February 13, 1984 interview with Edwards, DiPaolo was contacted by Edwards's wife. The contact resulted from the fact that Edwards had been taken to the Allegheny County Jail following his interview with DiPaolo, and had been detained there for a period of time. Edwards's wife contacted DiPaolo in an effort to have Edwards taken back to Western Penitentiary, where he was supposed to be incarcerated. DiPaolo did apparently contact the proper authorities to arrange for Edwards's return to his proper location at Western Penitentiary.

state actor. He notes that Edwards, while incarcerated at Western Penitentiary, had supplied information to prison officials on numerous occasions concerning matters of internal prison security. (Pl.'s Ex. V at 69.) This is of little moment, however, because there is no evidence that DiPaolo and/or Gunter were aware of this fact. Plaintiff also asserts that, four months after providing his signed statement of February 13, 1984, Edwards was transferred to the Mercer County Correctional Facility where he would be closer to his family. Plaintiff hypothesizes that this transfer was "no doubt" in consideration for his cooperation in the DiNicola case. However, this assertion does not inferentially establish a nexus between Edwards's conduct and the conduct of DiPaolo and Gunter. Moreover, the evidence which Plaintiff cites in support of this supposed transfer is an order from the Butler County Court of Common Pleas dated June 26, 1984, which simply directs that Edward be released to the custody of the Erie County Sheriff for purposes of testifying in a trial in Erie County. (Def.'s App. Vol. III, at 1512a.) It is not clear to the Court how this order demonstrates that Edwards received preferential treatment as consideration for his statements against DiNicola. It is not even clear how this document demonstrates that Edwards was transferred to Mercer County, since the order itself only releases Edwards to the custody of the Erie County Sheriff.

Plaintiff also makes much of the fact that, in his second criminal trial, Edwards testified that the second alleged confession by DiNicola—i.e. the alleged confession about having committed "an act" upon one of the children—was made in March, April or May of 1984. (Def.'s App., Vol. IX at 4498a–4499a.) It is not disputed that Plaintiff was discharged from Western Penitentiary on February 17, 1984, thus making it impossible for DiNicola to have given this alleged confession on the dates assigned by Edwards. Nevertheless, when put into perspective, this discrepancy is not significant and does not reasonably establish the inference that DiPaolo and Gunter recruited Edwards to give false information. There is no record evidence showing that Edwards, prior to testifying at the 1994 criminal retrial, had attributed DiNicola's "second" confession to the March–May 1984 time-frame. Instead, Edwards had previously claimed only that DiNicola made the second inculpatory statement shortly after Edwards's return from his February 13, 1994 meeting with DiPaolo, sometime near the end of DiNicola's incarceration at Western Penitentiary. Thus, the fact that DiPaolo did not double check to see whether DiNicola was still incarcerated in March or May 1984 is not significant because DiPaolo would not have had any reason to do so. He was aware that Edwards and DiNicola were both incarcerated at Western Penitentiary during that general time period. Plaintiff also asserts that Edwards had a reputation for dishonesty and that DiPaolo displayed reckless indifference to the truth in relying on Edwards's statements. However, even assuming for the moment that DiPaolo failed to sufficiently corroborate Edwards's statements about DiNicola, this would not establish that Edwards's statements were made at DiPaolo's behest or direction. In other words, the fact that DiNicola may have failed to independently corroborate Edwards's account of DiNicola's alleged confessions does not establish that Edwards was a state actor for purposes of § 1983.

In essence, Plaintiff's complaint against Edwards is not that Edwards unlawfully procured a confession at the direction of the police (since he denies ever making these alleged "confessions"). Rather, his claim is that Edwards conspired with Gunter and DiPaolo to attribute false confessions to DiNicola. None of the evidence relied upon by Plaintiff tends to prove this proposition. The Court finds that Plaintiff has failed to adduce evidence sufficient to establish that Edwards acted under color of state law. Accordingly, Plaintiff's § 1983 claims against Edwards cannot survive summary judgment.

### D.

■ Finally, we turn briefly to Plaintiff's § 1983 claim against the City of Erie. It is now well established that municipalities may be liable under § 1983 for the violation of an individual's constitutional rights if the alleged transgression implements or executes

a policy officially adopted by the governing body or informally adopted by custom. *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Where the alleged policy or custom is a failure on the part of the municipality to adequately train, supervise or discipline its police officers, liability may be established only where the city's failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Beck v. City of Pittsburgh*, 89 F.3d 966, 971–72 (3d Cir.1996) (citing cases). Based on the Court's ruling that the conduct of DiPaolo and Gunter did not violate Plaintiff's constitutional rights, there is no viable claim under § 1983 against the City of Erie. The Court will therefore grant the City's motion for summary judgment.

### 2. *Plaintiff's Malicious Prosecution Claim Under Pennsylvania Law*

 Plaintiff's only remaining cause of action is his common law claim for malicious prosecution. Under Pennsylvania law, an essential element of this tort is the lack of probable cause to support the plaintiff's prosecution. *Strickland v. University of Scranton*, 700 A.2d 979, 984 (Pa.Super.1997) (To establish a successful claim of malicious prosecution under Pennsylvania law, a plaintiff must show that the defendant "instituted proceedings without probable cause, with

malice, and that the proceedings were terminated in favor of the plaintiff.") (citation omitted). In the context of this tort, probable cause "does not require proof beyond a reasonable doubt, but rather, is defined as 'a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that a party is guilty of the offense.'" *Id.* (citing *Cosmas v. Bloomingdales Bros., Inc.*, 442 Pa.Super. 476, 660 A.2d 83, 86 (Pa.Super.1985)). Based on our review of the evidence, as set forth *supra* at Sec. III(1)(A), we conclude that Plaintiff's claim cannot survive summary judgment because, as a matter of law, the Defendants had probable cause to initiate criminal proceedings against DiNicola.[36] Insofar as Plaintiff's state claim is asserted against Vorsheck and/or Edwards, we separately conclude, based on an extensive review of the record, that there is insufficient evidence as a matter of law to establish their responsibility for Plaintiff's criminal prosecution.

Accordingly, judgment will be entered in favor of Defendants on Plaintiff's claim of malicious prosecution under Pennsylvania law.

### IV. CONCLUSION

Based upon the foregoing analysis, the Court will enter summary judgment on behalf of all Defendants in this action.

---

**36.** Based on our review of Pennsylvania law, it is not clear whether the results of the various polygraph tests may be considered in determining the existence of probable cause for purposes of Plaintiff's state law claim. However, the Court concludes that, even absent such evidence, the record establishes the existence of probable cause as a matter of law.